COLSHER et al. v. TENNESSEE ELECTRIC POWER CO.—84 S. W. (2d) 117.

Middle Section. February 16, 1935.

Petition for Certiorari denied by Supreme Court, June 29, 1935.

Walter M. Haynes and John F. Green, both of Winchester, for Colsher and others.

T. Pope Shepherd, of Chattanooga, for Power Co.

FAW, P. J. The transcript contains the record of three cases brought separately against the Tennessee Electric Power Company, but, by consent, tried together in the circuit court. The three plaintiffs below were, respectively, W. M. Colsher, Mrs. W. M. Colsher and Mrs. M. E. Colsher.

At the close of all the evidence, the trial judge, on motion of the defendant, peremptorily directed the jury to return a verdict against W. M. Colsher and Mrs. M. E. Colsher, and dismissed their respective cases at their cost, from which judgments W. M. Colsher and Mrs. M. E. Colsher (after motions for new trial in their behalf had been overruled) appealed to this court and have here assigned errors upon the action of the trial court in thus directing verdicts for the defendant in their respective cases. In the case of Mrs. W. M.. Colsher, the trial judge overruled ·a motion, made at the close of all the evidence, for a directed verdict in favor of the defendant, and submitted the case to the jury, and the jury found the issues in favor of the plaintiff and assessed her damages at $2,500; but, on defendant's motion for a new trial, the court held that the judgment was excessive to the extent of $1,000, and suggested a remittitur of that sum, which was accepted by the plaintiff under protest, and (the other grounds of defendant's motion for new trial having been overruled) judgment was accordingly entered in favor of Mrs. W. M. Colsher and against defendant, Tennessee Electric Power Company, for $1,500 and all the costs of the cause. From this judgment defendant power company appealed to this court, and has assigned errors here.

Mrs. W. M. Colsher appealed from the action of the trial court in remitting $1,000 of the jury's verdict over her protest; but she has not assigned error, and it is stated by her counsel (in the brief) that she desires to dismiss her appeal and accept the judgment of the court in her case "in its entirety." Her appeal will therefore be dismissed without further consideration.

## Mrs. W. M. Colsher's Case.

As before stated, defendant power company has appealed from the verdict and judgment (as reduced by the trial judge) in favor of Mrs. W. M. Colsher.

For convenience, we will refer to the parties as plaintiff and defendant, respectively, as they appeared on the record below.

Defendant's first assignment of error is that there is no evidence to support the verdict, and its second assignment is that the trial court erred in overruling defendant's motion for a directed verdict. It is therefore necessary for us to examine the pleadings and the evidence.

Mrs. W. M. Colsher sued defendant power company for $10,000 as damages. Undisputed proof in the record supports certain averments of plaintiff's declaration as follows:

"That the defendant company on the 13th day of July, 1933, was the owner and operator of a certain electric power system, a part of which was located in Winchester, Franklin County, Tennessee. The said company did furnish, both before said date and at said date, electric power for and to residents and citizens of Winchester, Franklin County, Tennessee, said electric power being used for lighting, cooking, refrigerating purposes and numerous other purposes.

"That the plaintiff is the wife of W. M. Colsher and resides in Winchester, Franklin County, Tennessee, on the South corner of 6th and High Streets, and has done so for a considerable period of time; that plaintiff and said W. M. Colsher have been married for 17 years and are the parents of 5 children, the youngest of which is 8 years of age and the oldest of which is 15 years; that plaintiff manages and looks after all household affairs. Plaintiff is and has been for several years in delicate condition, absolute quiet and rest being necessary to her health. Plaintiff is and has been for a number of years under the regular attention of a physician.

"For and in consideration of a certain sum of money paid each month by W. M. Colsher, husband of the plaintiff herein, said defendant company did furnish the household of said plaintiff electrical energy for lighting, cooking and for refrigerating purposes. The husband of plaintiff, to-wit, W. M. Colsher, did pay the defendant company each month the said certain sum of money for said electric power used in the lighting of the home above referred to, consumed by an electrical refrigerator situated therein and the heating of an electrical stove, infrequently used, in the cooking of meals. Said electrical power consumed in the household of the plaintiff is and was measured by a meter located on the back porch of plaintiff's home, said porch being encased by lattice work and a lattice work door."

Our statement, supra, that the foregoing averments are undisputed in the proof should be qualified by the further statement that defendant did not concede that plaintiff's husband had paid each month for all the electric current used in his home, but introduced evidence tending to show that the meter in plaintiff's home had been so manipulated that it did not register all the current there used. This was a matter of controversy on the record. The remaining averments of plaintiff's declaration, in their material aspects, present the controverted issues in the case. These averments are as follows:

"That on or about July 13th, 1933, between the hours of 8:00 and 9:00 o'clock P. M. while plaintiff herein was sitting on her front porch talking with her mother-in-law, Mrs. M. E. Colsher, and her children, a disturbance took place on the back porch. Whereupon, one of the children of the plaintiff ran back to the rear of the house and returned and notified the plaintiff that some men were attempting to break into their home. Whereupon, the husband of plaintiff, W. M. Colsher, investigated the noise and found that the agents, employees and servants of the defendant company had entered, forcibly and without the permission or consent of the plaintiff or her husband, her back porch and were in an alleged attempt to examine the meter above referred to. Whereupon, plaintiff's husband, W. M. Colsher came back into the house to get firearms to protect his family. Whereupon, the above mentioned agents, employees and servants of the said company did flee.

"Plaintiff, therefore, charges that, owing to the delicate condition of her health and the absolute necessity of her having quiet and peaceful rest, said disturbance rendered her in a nervous condition, she believing at the time that her home was either being burglarized or an attempt being made to kidnap one of the children. Plaintiff has been unable to sleep or to rest to any degree of satisfaction since said occurrence; plaintiff's nervous system is permanently impaired and her condition has been made much worse than it was prior to the occurrence above referred to; that plaintiff cannot and will not stay at home by herself at night and is in a nervous strain practically all of the time since the uncalled for and wanton action of the agents, employees and servants of the defendant company; and because of the conduct, above complained of, of the agents, employees and servants of the defendant company, she was thereby, then and there, put in great peril and was greatly frightened and afterwards mentally disordered; and so remained for a long period of time, to-wit, from that day until the commencement of this action; during all of which time, the plaintiff suffered great nervous disorder and mental anguish and was prevented from attending to and transacting her necessary business and household affairs; and was permanently injured; and her ca-

pacity for work, labor and business, and for the enjoyment of life was greatly and permanently impaired; and the aforesaid reckless, careless and negligent conduct of the defendant company was the proximate cause of her said injuries and she was without fault on her part and has been damaged to the extent of Ten Thousand ($10,000.00) Dollars, for which she sues and demands a jury to try her cause.''

To the foregoing declaration, defendant power company pleaded, first, the general issue—not guilty—and, second, a special plea, as follows:

''For further plea, defendant says that upon the occasion complained of its servants visited the premises of the plaintiff for the purpose of inspecting the meter and connections installed in plaintiff's house as part of the electric service, as they had a right to do under the rules and regulations approved and adopted by the Public Utilities Commission of the State of Tennessee. With respect to the right to visit the premises and inspect the equipment, the said rules provide as follows:

'' 'Section 16. The properly authorized agent of the Company shall at all reasonable hours have free access to the premises of the consumer for the purpose of examining, repairing or removing its meters or other property and the consumer agrees to protect at all times such meters and other property from interference or damage.'

'' 'Section 17. The consumer shall not make or allow to be made any change in or additions to his installation without notifying the Company in writing, nor shall he use current for any purpose or in any manner other than that specified by his application for service, or agreement with the Company without first having received the written consent of the Company.'

'' 'Section 21. The consumer is forbidden to interfere with or allow others to interfere with the meters or other appliances of the Company; in case of any trouble therewith complaint must be made direct to the Company's office.'

'' 'Section 23. The consumer shall at all times during the period served maintain the wiring equipment and apparatus to be furnished by the consumer in such condition and repair as may be required by the Company and by any statute, law, or city ordinance.'

''The defendant through its servants had reason to believe that some disorder existed in the meter or connections, and for this reason visited plaintiff's premises for the purpose of making an inspection and discovering, if possible, such disorder. Defendants carried out such inspection without the use of force, or threats, or any disorderly conduct and avers that no rights of the plaintiff were violated or invaded.''

It is undisputed that two employees of defendant entered an in-

closed porch at the rear of plaintiff's residence, through a lattice door, about 8 o'clock in the evening of July 13, 1933, for the purpose of inspecting the meter and while there had a conversation for five or ten minutes with plaintiff's husband, W. M. Colsher, which conversation was, at first and for the major part of said period, friendly in character, but W. M. Colsher finally became very much enraged and, after applying some very abusive epithets, garnished with profanity, to the power company officials, went into another part of his house and procured a shotgun and returned with it to the porch, but found that defendant's said employees had left the place in the meantime.

One of the two employees of defendant who thus visited plaintiff's home was J. H. Neal, defendant's meter superintendent for a "district," which included Winchester. He lived at Murfreesboro, but was accustomed to go to Winchester frequently during each month for the purpose of supervising and conducting the purchase, installation, inspection, and repair of meters used in the homes and places of business of defendant's customers. Neal was accompanied on the occasion in question by G. A. Pfiel, who was meter reader and collector for defendant at Winchester.

When defendant's inspectors arrived at plaintiff's home the lights were burning in several rooms of the house. Plaintiff and her mother-in-law, Mrs. M. E. Colsher, were seated on the front porch. Plaintiff's husband, W. M. Colsher, was lying "across a bed" in the "front room," asleep. Two of plaintiff's children, viz., Harriet, a girl 13 years of age, and a little boy 8 year of age, were in the kitchen, from which a door opened onto the latticed porch, where the meter was located.

So far as the proof for plaintiff discloses, the first inmate of plaintiff's home who discovered the presence of defendant's inspectors was Harriet Colsher, the aforementioned 13 year old daughter of plaintiff. She testified that she and her little brother were in the kitchen; that she was "standing right by the side of the door" opening from the kitchen "into that little latticed back porch;" that said kitchen door was partly open; that her attention was first attracted to "the jerking of the door" (referring to the "lattice door" to the porch). That "they was pushing a little and there was a flashlight going up and down the door;" that she "asked who it was" and they didn't answer her, and she asked three times and all they said was "its just me;" that she then "went and called mamma" and "told her there was somebody trying to get into the house."

Referring to the evening of July 13, 1933; plaintiff Mrs. W. M. Colsher testified that, while she and her mother-in-law were seated on the front porch of her home, her daughter, Harriet, came and told her "there was somebody on the back porch;" that she (plain-

tiff) "ran and told Mr. Colsher" and he got out of bed and went out the back way, and that later he came in the house and got his gun and went out the back way again.

W. M. Colsher, plaintiff's husband, testified that he was at home on the night of July 13, 1933; that he got home around four or five o'clock that afternoon and was there after that "all the time;" that he was asleep and his wife waked him up and told him that "somebody was on the back porch;" that he went to the back porch and found two employees of the light company there; that he knew one of them (Pfiel) and had known him practically ever since he had lived in Winchester; that one of the men was "reading the meter," "looking at the switch box," "kind of inspecting around," "looking at the fuse," and "looking at the meter;" that it excited him to find them back there without hearing them come in and without knowing anything about them being there; that "they said they had come in there to inspect the meter;" that he said to them: "I don't think this is a very good time to come into a man's house to inspect his meter;" that he "used some pretty rough language to them," and when he did that "one of the men ran his hand back to his pocket as if he were going to get something," and when he did that he (the witness) ran in the house and got his shotgun, but when he returned to the porch with his gun, the men had gone.

However, on cross-examination, W. M. Colsher admitted that, after he found the two men on the back porch, he discussed the condition of the meter with them "in a very friendly way" for "some five or ten minutes," during which period he went into the house and turned on some lights and the stove, and that he did not get mad until he had gone back there and discussed with them the controversy about the meter and "the condition in which it was."

Mrs. M. E. Colsher, the mother of W. M. Colsher, stated that she was on the front porch with Mrs. W. M. Colsher when the little girl came out and told them "about somebody being out there on the back porch;" that she "heard a commotion on the back porch," but that she did not go back there; and this witness did not undertake to testify as to what occurred on the back porch. A number of witnesses testified that they knew the character of Mr. and Mrs. W. M. Colsher and Mrs. M. E. Colsher, respectively, and that it was good, and they were worthy of credit on their oath.

The defendant introduced in evidence the rules approved by the Public Utilities Commission under which rules defendant operated in furnishing electric current to users, including W. M. Colsher. These rules, as proved (so far as they are invoked by defendant in this case), are hereinbefore copied as a part of defendant's second plea, to which we refer for their contents without repetition here.

The testimony of J. H. Neal and G. A. Pfiel is to the effect that they had received information which indicated that the meter in

W. M. Colsher's residence was not registering the current being used there, and for that reason they decided to make an investigation; that such investigations were usually made at night because the "load" was on at that time; that Colsher's home was situated on a corner lot and they drove up the side street and parked their car and went to the rear of the house because they knew the meter was located on the back porch; that the door to the back porch (the lattice door) was standing open (Neal saying that it was pushed in and Pfiel saying that it was pulled out), and they walked in on the porch and Neal knocked and a little boy came to the kitchen door and asked what he wanted, and Neal told him that he wanted to check the voltage and asked him if his mother was there; that the boy went back in the house and Neal examined the meter (with the aid of a flash-light he carried) and found that it was not turning—that "it was not registering on the disc;" that Neal proceeded to test the voltage at the switch, and while he was doing that, W. M. Colsher came out on the porch, accompanied by a little girl and the little boy; that when W. M. Colsher came out, Neal told him that there was "something wrong," and Colsher said, "yes, there is a blown fuse on the left hand side"—it "blew out about two weeks ago;" whereupon Neal stated to Colsher that "that fuse being blown would prevent the meter from registering with a load on," to which Colsher replied that he had not seen anything the matter with the meter; that Neal then said, "Come here and I will show you the meter;" that thereupon Colsher said: "Wait a minute and I'll show you, and then went in and turned the kitchen light on;" that Neal then asked Colsher to turn on the switch at the stove, and Colsher said: "That's all right, it's already been turned off and we don't use the stove very much any way." The remainder of the incident is related by Neal as follows:

"So we talked the matter over for a minute or so, and he says, 'Wait, a minute, let's get this matter right, you say that this meter doesn't register.' And I said, 'Yes, there is something the matter with it, the meter has been tampered with some way.' And he says 'Well, I haven't tampered with the meter, or done anything to not cause it to register.' And I says, 'Well, you can see there is something wrong with it.' He says, 'Well, I pay six or seven dollars a month for my bill.' And I said, 'Well, I think if you will examine your bills, you will see that you are not paying that much. If you have any bills that show you are paying that much per month, I would like to see them.' He says, 'Well, I haven't got an bill, but I have been paying five or six dollars a month.' And I says, 'Well, I think I can show you that you have not been paying that much.' And he used some pretty strong language toward us— shall I tell you what he said?"

Whereupon Neal, upon being told to "tell what he said," re-

peated some profane language and offensive epithets used by Colsher. and not denied, and Neal then proceeded with his narrative as follows:

"Well, I stopped for a minute and said to him, 'What did you say?' And he says 'I don't mean you, I am not talking about you, but think your Company is a lot of God damned crooks.' And I says, 'Mr. Colsher, I don't like you to say anything about the men that I'm working for.' And he was standing there in the kitchen door and he stepped back in the kitchen, and says, 'I'll show you what I mean,' and he went back into the house. So when he did that, I turned to the man that was with me, after we had inspected the meter, and we walked back and walked out, and got in the car, and drove off."

The testimony of Neal and Pfiel is that a wire had been used as a "strap-over" to complete the circuit where a fuse had "blown out," and it is shown by their testimony, and that of other witnesses for the defendant, that this prevented the meter from registering all the current used in Colsher's house.

W. M. Colsher testified that he had "strapped-over" the blown fuse as it was found by Neal and Pfiel, but that he did not know that it affected the meter in any respect. He stated that he had had considerable experience in wiring houses for electric current, but that he had never installed or inspected meters and was not familiar with their mechanism or operation.

As before stated, Neal and Pfiel testified that the "lattice door" to the porch was open. The testimony on behalf of the plaintiffs below is to the contrary. W. M. Colsher says that the lattice door was "shut" and "fastened;" that "there was a latch on the insid that fastened it," and they had to "pull the door" to "get it open" and, to "get it shut" they had to "slam it," because the latch was "out of order;" that they "kept it fastened because of some chickens that were kept out there;" that upon closing the door that night he caught his foot in it, "which made him certain he remembered shutting the door on that night."

Harriet Colsher said that the lattice door was "locked" and that they (Neal and Pfiel) "were sort of pulling the door and it made a lot of racket."

Mrs. W. M. Colsher stated that the lattice door "latched on the inside" and was usually fastened at night, but she could not state that it was fastened on the night in question; and the testimony of Mrs. M. E. Colsher is substantially to the same effect.

However, we have not found any evidence to support the statement in the brief for one of the plaintiffs that the door was "hooked," and that Neal and Pfiel broke the hook in effecting an entrance.

In order that the controversies with respect to matters of

fact may be more clearly seen, and also in order that undisputed facts disclosed by the evidence for defendant may be taken into consideration along with the evidence for plaintiff, we have stated certain portions of the evidence introduced on behalf of defendant; but, under rules too well settled to need citation of authority, the verdict of the jury has settled (in favor of the plaintiff Mrs. W. M. Colsher) all conflicts in the evidence, and this court must accept as true the strongest legitimate view of the evidence in her favor, and discard all countervailing evidence.

By virtue of the rules and regulations approved and adopted by the Public Utilities Commission of this state, under which defendant furnished electric current to consumers, defendant's agents had the right of free access to Colsher's premises at all reasonable hours for the purpose of examining the meter. However, it is elementary that a lawful right may be exercised in an unlawful manner. If defendant's agents entered Colsher's house at a reasonable hour and effected their entrance in an ordinarily reasonable and prudent manner, they were not trespassers, but were licensees. On the other hand, if they effected their entrance to the house or conducted themselves while in the house and engaged in the duties for which they were employed by defendant, in a wrongful or negligent manner, and injury to the occupants of the house proximately resulted therefrom, the defendant is liable for such resulting injury. Warfield Natural Gas Co. v. Hall, 254 Ky., 805, 72 S. W. (2d), 417.

The learned trial judge gave the jury instructions in substantial conformity with the rules above stated as follows:

"In entering the home of the plaintiff, the defendant's employees would be charged with the duty of conducting themselves in a proper and reasonable manner. If they entered in an unreasonable manner, at an unreasonable time, or conducted themselves in an unreasonable manner, after they had entered the home, and by reason of that, or as a result of that, damage resulted to some inmate of that home as a proximate cause of this unreasonable entry the unreasonable way of entry, or the unreasonable time of entry, or any unreasonable conduct on the part of the employees after entry, then the defendant would be liable therefor. In considering the case, you will consider and weigh the testimony submitted to you, as to whether or not there was a reasonable entry into the premises of the plaintiff, whether entry was made at unreasonable hours, and whether or not the conduct of the employees was reasonable after entry. You will consider this upon the proposition of what would be regarded as a reasonable method of entry, reasonable time of entry. and the reasonable conduct of employees after they did so enter the premises of the defendant.

"In considering this matter you will take into consideration

just what an ordinarily prudent man would have done under the circumstances. You will consider what would be the conduct of an ordinarily prudent man, situated as these employees of defendant were situated; the hour of entry, the manner of the entry, and the conduct after the entry, and consider what an ordinarily prudent man would have done, and if the manner of entry and the time of the entry, and the conduct of the employees after entry was that of an ordinarily prudent man, then the defendant would not be liable. But if you should consider that the manner of entry was unreasonable or that the time of entry was unreasonable, or that the conduct of the employees after entry was unreasonable, then, that would constitute negligence, and if that negligence was the proximate cause of the injury to an inmate of that home, why, then, there would be a liability on the part of the company.''

 Upon the evidence which we have, in substance, narrated (together with other evidence hereinafter stated with respect to her injuries), and under the instructions of the trial judge above quoted, the jury found the issues in favor of the plaintiff Mrs. W. M. Colsher, and we are not prepared to say that there is no material evidence to support a finding that defendant's employees (Neal and Pfiel) entered Colsher's home on the occasion in question in a wrongful and negligent manner, which, under the circumstances disclosed, they might reasonably have foreseen would frighten the occupants thereof. It is not within our province to express an opinion with respect to the preponderance of the evidence. But a negligent act is not in itself actionable, and it affords a basis for an action only when it results in injury to another. In order to support an action there must be not only the negligent act, but a consequential injury which is the gravamen of the charge. 20 R. C. L., pp. 9-11.

Plaintiff alleges in her declaration that the ''reckless, careless and negligent conduct of the defendant company was the proximate cause of her said injuries,'' and we are of the opinion that under the proof the case resolves itself into an action for negligence.

It is necessary, therefore, to inquire whether, as the proximate result of the aforesaid negligence of defendant's agents, the plaintiff Mrs. W. M. Colsher suffered any injury for which, under the law, she is entitled to recover compensation from the defendant.

At the time of the trial of this case below the plaintiff Mrs. W. M. Colsher was 38 years of age, had been married 17 years and had five children. She had ''lung trouble'' and, for about 5 years, had, on the orders of a physician, been taking the ''rest cure,'' which consisted of getting all the rest and sleep that she could ''during the day as well as at nights.'' Under this treatment she had ''improved a good deal'' and had gained in weight. She testified that it frightened her very much when her daughter came to the front

porch and told her that there were some men on the back porch, and that she was frightened more when her husband came in the house and got his "pistol," because she "didn't know what was going on back there;" that she was frightened at the start of the "transaction" and at the whole transaction, and all the way through it.

The following excerpts from the record contain her testimony with respect to the effect of her said fright:

"Q. What effect did this disturbance have upon your general health?

"Mr. Shepherd: I object to that.

"Court: Well, she can state any condition that was brought about.

"A. Well, I cannot sleep at night. It has made me so nervous that I cannot sleep, and did not sleep any for a long while after that. It made me very nervous, much more than I had been before. I have never been frightened that way before in my life.

"Q. Had you been in a nervous condition before that? A. No, sir, I had not.

"Q. Have you been able to rest since that like you did before? A. No, sir, I have not had a good night's rest in some time.

"Q. Well, what effect did that disturbance have upon you? A. Well, I was very scared at the time, and that made me very nervous, and I have not been like I was before since then.

"Q. Have you been able to improve in health since then like you were before? A. Well, of course, I have been extremely nervous, that's about the only thing I can say.

"Q. Well, have you been able to improve in health—since then? A. No, I have not.

"Q. Do you stay home alone at nights? As you did before? A. No, I do not.

"Q. Have you ever been frightened like that before? A. No, I have not ever been frightened like that before.

"Q. After this occurrence did you stay at home by yourself without someone being with you? A. No, I have never been at home alone.

"Q. Do you think you would be able to stay at home alone now like you did before? A. I don't think I would.

"Q. Do you think you would be able to stay there by yourself

"Objected to. Objection overruled. Exception for defendant.

"A. I don't think I would.

"Q. Are you in a highly nervous condition? A. Yes, I am quite nervous.

"Q. And have you been ever since this occurred? A. Yes, sir.

"Q. Were you before it happened? A. No, I was not. . . .

"Q. How long have you been sick? A. About five years.

"Q. During that time, your health has been bad, and you have been in a nervous condition, high-strung and nervous? A. Well, I haven't been feeling so nervous until I had that fright.

"Q. I understood you to say you were pretty nervous? A. Of course, I am nervous.

"Q. A little noise disturbs you? A. Yes, sir.

"Q. And any unusual occurrence will cause you to get nervous and excited? A. Yes, sir. . . .

"Q. You say that when you went and called your husband, you didn't tell him who it was? A. No, I didn't know at that time who it was.

"Q. You say then that you got scared, and that that made you nervous? A. Yes, sir."

W. M. Colsher's testimony with respect to his wife's condition was as follows:

"Q. Has your wife been suffering with tuberculosis for sometime? A. About five years.

"Q. Is absolute peace and quiet necessary for her treatment? A. That's what the doctors say.

"Q. Is it necessary that she be kept quiet, and for her to sleep some during the day time? A. Yes, sir. That's especially so at night.

"Q. Since this accident occurred, has she been able to sleep like she did before? A. I don't think she has. In fact, I know she has not, because I would ask her in the morning 'How did you sleep last night?' and she would say 'I didn't sleep very well.' She would say that she didn't get any sleep until twelve or one o'clock.

"Q. Has that condition prevailed for some time? A. Yes.

"Q. You think she has been in a very much worse nervous condition than she was before? A. Yes, very much."

The foregoing is all the evidence relating to the condition of Mrs. W. M. Colsher subsequent to the occurrence in question.

In this state, damages cannot be recovered for fright alone, but may be recovered for physical pain and suffering resulting from fright. In Memphis Street Railway Co. v. Bernstein, 137 Tenn., 637, 639, 194 S. W., 902, the court said:

"The authorities are quite in accord that mere fright cannot be made the basis of a cause of action, and that damages cannot be allowed for fright alone. [Citing authorities.]

"The cases are not in harmony as to the right of a plaintiff to recover for physical pain and suffering resulting from fright. Many decisions deny this right. We think, however, the better reasoned cases hold that there may be a recovery for bodily pain and suffering proximately following fright occasioned by the negligence of a defendant. The suit, under such circumstances, is based upon the physical pain and suffering endured by the plaintiff, and not upon

the fright itself. Such pain and suffering of course must be the proximate result of the negligence. If the mental emotion occasioned by the negligence clearly produced the physical suffering, then the latter is in direct line of causation from the wrongful act of the defendant. While it may be somewhat more difficult in such a case to show the connection between the cause and effect, nevertheless, if the proof is satisfactory, we think a recovery should be allowed.''

In Nuckles v. Tennessee Electric Power Co., 155 Tenn., 611, 299 S. W., 775, it was held that, although damages may be recovered for physical pain and suffering resulting from fright or shock, that fright or shock resulting to one from witnessing danger to or injuries inflicted by a wrongdoer upon another affords no ground of recovery to that one, even though the imperiled or injured person be the minor son of the frightened person.

See, also, Annotations, 11 A. L. R., 1119, page 1134, and 32 A. L. R., 921, page 922.

No medical witnesses were examined in the instant case, and we are left to determine, without the aid of expert testimony, whether a ''nervous condition,'' or ''extremely nervous'' condition, or ''highly nervous'' condition, resulting from fright, which causes loss of sleep and makes one afraid to ''stay at home alone,'' constitutes ''physical pain and suffering.''

In Bowers v. Colonial Stages Interstate Transportation Inc., 163 Tenn., 502, 506, 43 S. W. (2d), 497, 498, the court said that ''The distinction between physical and mental suffering must be kept in mind;'' and it was held in that case that there could be no recovery for ''mental suffering only.''

In the introduction to a note on the subject of ''Right to recover for physical injury resulting from fright caused by a wrongful act,'' in 3 L. R. A. (N. S.), p. 49, the editor of the note says:

''That mere fright, without any physical injury resulting therefrom, cannot form the basis of a cause of action, is well settled. It cannot be denied that the suffering in such cases may be very real and that it may be the proximate result of a negligent act. But such injuries are, as a rule, slight and unimportant; and, even when they are considerable, they give no right of action, since the law is designed to meet general conditions, and not exceptional cases. The chief reason, probably, for denying recovery, is the difficulty of administering any other rule in practice. Many ill consequences follow from wrongs for which the law cannot afford redress because of the inadequacy of the methods and means of courts to reach just results with sufficient certainty. The evidence of such injury is entirely within the control of the sufferer, and the opportunity for simulation is so great, and the means of testing the truth of the allegations so inadequate, that a wise public policy

seems to forbid the allowance of a recovery in such cases. But when the physical frame is visibly affected by the fright, these considerations are no longer of much force. When a material physical injury has resulted from fright caused by a negligent act, simple justice and all the analogies of the law seem to require that the person guilty of the negligence shall be liable in damages for the results thereof.''

It should be remembered that we are not here dealing with a case of traumatic neurosis, wherein injuries to the nervous system result from a physical injury, and in which case mental suffering (frequently called "mental anguish") may constitute an element of damage. Davidson Benedict Co. v. Severson, 109 Tenn., 572, 614, 72 S. W., 967; City of Chicago v. McLean, 133 Ill., 148, 24 N. E., 527, 8 L. R. A., 765, and Case Note thereto.

Fright is a "mental emotion" (Memphis Street Railway Co. v. Bernstein, supra), and it is a matter of common knowledge that any kind of annoying mental disturbance tends to produce sleeplessness. It is also a matter of common knowledge that sudden fright sometimes so affects the mind and nervous system of an individual as to render him (or her) more fearful and timid than formerly. But such consequences of fright are so elusive in character and the means of testing the truth of the allegations so inadequate, that a wise public policy seems to forbid the allowance of a recovery in such cases. (See authorities cited, supra.)

We do not find in the record any material evidence of actionable injury to the plaintiff Mrs. W. M. Colsher, and it results that defendant's first and second assignments of error are sustained.

In view of our action upon defendant's first and second assignments of error, supra, there is no occasion to discuss defendant's third assignment, which is, that the verdict is excessive, etc., and the remaining assignments of defendant become immaterial and need not be considered.

W. M. Colsher's Case.

In his case, plaintiff W. M. Colsher assigns as error the action of the trial court in peremptorily instructing the jury, at the close of all the evidence, to find in favor of the defendant.

It is not claimed that W. M. Colsher was frightened by anything that transpired on the occasion in question. He states in his testimony that he was humiliated, embarrassed, and disturbed by the actions of the employees of the power company in entering his house in the manner and under the circumstances disclosed by the evidence. But humiliation and embarrassment are mere "mental emotions" for which no recovery can be had under the pleadings and proof in this case. There is no predicate in the record for an action of slander. W. M. Colsher's assignment of error is overruled.

Mrs. M. E. Colsher's Case.

Mrs. M. E. Colsher likewise assigns as error the action of the trial judge in directing a verdict for the defendant in her case.

Mrs. M. E. Colsher testified that the information which the little girl brought to the front porch "about somebody being out on the back porch," and the commotion which she heard "back there," frightened and excited her, and that she had been "nervous ever since then," and that she does not sleep now as well as she did before; but she does not testify that she had suffered any impairment of health or other physical injury as a result of such fright. The authorities cited in connection with our disposition of the case of Mrs. W. M. Colsher, supra, likewise apply to the case of Mrs. M. E. Colsher, and her assignment of error is overruled.

It results that the judgment in favor of Mrs. W. M. Colsher is reversed, the verdict of the jury in her favor is set aside, and her suit is dismissed.

The judgments of the trial court dismissing the respective suits of W. M. Colsher and Mrs. M. E. Colsher are affirmed.

The costs of the cause, including the costs of the appeal, will be adjudged against W. M. Colsher, Mrs. W. M. Colsher, and Mrs. M. E. Colsher.

Crownover and DeWitt, JJ., concur.