**Wayne MILLER and Elizabeth Ann Miller, Appellants,**

v.

**David WILLBANKS, M.D., Hamblen Pediatric Associates, Inc., and Morristown–Hamblen Hospital, Appellees.**

Supreme Court of Tennessee, at Knoxville.

Nov. 15, 1999.

Judy Pinkston McCarthy, Dennis M. McCarthy, Knoxville, for Appellants.

Douglas L. Dutton, Amy V. Hollars, R. Franklin Norton, Gary G. Spangler, Knoxville, for Appellees.

## OPINION

BARKER, J.

### INTRODUCTION

We granted this appeal to decide whether the Court of Appeals erred in holding that expert medical or scientific proof of a serious mental injury is required to support the plaintiffs' claims for intentional infliction of emotional distress. The trial court granted the defendants' motion for summary judgment because the plaintiffs failed to have available expert proof to corroborate their claims of having sustained serious mental injuries. The Court of Appeals affirmed the trial court's dismissal of the case. After careful consideration of the record in this case, the applicable law, and the arguments of the parties, we conclude that expert medical or scientific proof of a serious mental injury is generally not required to support a claim for intentional infliction of emotional distress. Accordingly, for the reasons herein, we reverse the Court of Appeals and remand this case to the trial court for further proceedings.

### STANDARD OF REVIEW

Summary judgment is appropriate if the movants demonstrate that no genuine issues of material fact exist and that they are entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. We must take the strongest view of the evidence in favor of the nonmovants, allow

all reasonable inferences in their favor, and discard all countervailing evidence. *See Byrd v. Hall,* 847 S.W.2d 208, 210–11 (Tenn.1993). Because our review concerns a question of law only, the trial court's judgment is not presumed correct, and our review is de novo on the record before this Court. *See Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn.1997).

## BACKGROUND

On September 19, 1995, Elizabeth Ann Miller gave birth to Heather Nicole Miller at the Morristown–Hamblen Hospital Association ("the Hospital"). Prior to delivery, Mrs. Miller signed a form authorizing Dr. David Willbanks of Hamblen Pediatric Associates, Inc., to provide post-natal examinations and treatment for Heather. The next day, the Hospital discharged Mrs. Miller but kept Heather pursuant to its policy of providing care for 48 hours to infants delivered by caesarean section.

Early September 21, Heather awoke with an elevated body temperature, heart rate, and respiratory rate. A nurse contacted Dr. Willbanks concerning Heather's condition. Dr. Willbanks went to the Hospital, examined Heather, and diagnosed her as suffering from Drug Withdrawal Syndrome (DWS). Dr. Willbanks, though, did not test Heather for the presence of drugs or discuss his diagnosis with Mrs. Miller. By contacting relatives of Mrs. Miller, the Hospital alerted Heather's parents to the infant's condition. After becoming aware of Heather's condition, Wayne Miller, Elizabeth Ann Miller's husband and Heather's father, contacted the Hospital by telephone and spoke with Dr. Willbanks. Dr. Willbanks informed Mr. Miller that Heather was "in distress" and possibly suffering from sepsis, but he would not elaborate in response to questioning by Mr. Miller. Dr. Willbanks also notified Mr. Miller that he would be performing a lumbar puncture on Heather, though he would not explain the purpose for the procedure, indicating only that it was necessary.

Mr. Miller told Dr. Willbanks that he and his wife were going to come immediately to the Hospital, and Dr. Willbanks agreed to wait for them to arrive. The Millers arrived at approximately 4:45 a.m., but Dr. Willbanks was not present and left no message. A nurse directed the Millers to the nursery where they observed Heather lying in a crib with an intravenous needle protruding from her scalp. No medical personnel would answer the Millers' questions concerning Heather's condition, so the Millers waited until approximately 8:30 a.m. for Dr. Willbanks to return.

When Dr. Willbanks finally met with the Millers, he explained that Heather had been acting jittery and crying excessively. He asked Mrs. Miller if she used any drugs during her pregnancy. When Mrs. Miller responded that she had occasionally taken Tylenol, Dr. Willbanks informed her of the importance of answering honestly concerning drug use during pregnancy. Despite Mrs. Miller's denials, Dr. Willbanks said that he did not believe her and that he had frequently seen DWS in infants. Dr. Willbanks stated that he was positive of his diagnosis and that he would continue treating Heather for DWS. Mrs. Miller then agreed to Dr. Willbanks's request that she take a drug test.

Following the meeting between Dr. Willbanks and the Millers, rumors that Heather was a "drug baby" began circulating throughout the Hospital. A Hospital social worker approached the Millers later in the day and questioned them concerning their past drug use, backgrounds, living arrangements, and other children. In addition, Mr. Miller overheard two unidentified people discussing the "drug baby" in the ward. Hospital nurses began treating the Millers rudely, and when Mr. Miller's parents visited the Hospital, they left angry believing Mrs. Miller was responsible for Heather's medical problems.

Throughout the day, the Millers unsuccessfully sought information concerning

the drug tests and Heather's condition. At approximately 8:00 p.m., the head nurse finally informed Mr. Miller that the drug tests administered to Mrs. Miller and Heather came back negative at 11:00 a.m. The following day, Dr. Toffoletto, who was an associate of Dr. Willbanks, confirmed the nurse's statement that the drug tests revealed no problems and informed the Millers that the DWS treatments were being continued only as a precaution.

Disregarding the negative drug test results, Dr. Willbanks reported his suspicions concerning Mrs. Miller's alleged drug use to the Grainger County Health Department. Within one week, a social worker and nurse from the Department visited the Millers' home, interviewed the Millers, inspected their living arrangements, and examined Heather—all over Mr. Miller's objections. When the social worker returned less than two weeks later, Mr. Miller reiterated his objections, and the social worker did not visit again.

The Millers sued Dr. Willbanks, Hamblen Pediatric Associates, and the Hospital for the tort of intentional infliction of emotional distress.[1] The defendants then moved for dismissal or summary judgment, which the trial court granted due to the plaintiffs' lack of expert evidence to support their claims of serious mental injury. The Court of Appeals affirmed the decision of the trial court.

We granted the plaintiffs' appeal to decide whether the Court of Appeals erred in holding that expert medical or scientific proof of a serious mental injury was required to support the plaintiffs' claim for the intentional infliction of emotional distress.

## DISCUSSION

### A. *History of Intentional Infliction of Emotional Distress in Tennessee*

Because our decision is based, in large part, upon the development of the law of

mental distress and the erosion of traditional barriers to recovery, we will briefly address the evolution of the law of intentional infliction of emotional distress. At early common law, the right to recover for mental injuries sustained through intentional conduct was afforded little respect. In an influential decision, Lord Wensleydale declared: "Mental pain or anxiety the law cannot value, and does not pretend to redress, when the unlawful act complained of causes that alone." *Lynch v. Knight,* 9 H.L. Cas. 577, 598 (1861).

However, despite the law's early reluctance to provide a remedy for mental distress, "courts were permitting recovery for emotional injuries alone, frequently by stretching the meaning of traditional tort categories." Daniel Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Colum. L.Rev. 42, 44 (1982). In Tennessee, for example, as early as 1888, courts applied broad interpretations of traditional legal principles to reach a similar result—remedying purely emotional injuries. *See, e.g., Wadsworth v. Western Union Tele. Co.,* 86 Tenn. 695, 8 S.W. 574 (1888) (permitting plaintiff to proceed with suit for injury to the "feelings, anguish, and pain of mind," based on defendant's failure to comply with statutory obligations).

In *Knoxville Traction Co. v. Lane,* 103 Tenn. 376, 53 S.W. 557 (1899), Maggie Lane sued Knoxville Traction Company for "injuries to [her] feelings and sensibilities" caused by the conduct of an employee of Knoxville Traction. The employee, a motorman, loudly announced that Lane was a "damn good-looking old girl" who he "would like to meet . . . when she gets off." *Id.* at 558. When Lane rebuffed his advances, the employee made further abusive comments and accused Lane of being

---

1. The plaintiffs also brought claims for negligent infliction of emotional distress, defamation, and invasion of privacy, but they did not appeal the lower court's disposition of these claims. Accordingly, we do not address them.

"nothing but a whore." *Id.* at 559. Finally, after Lane began crying, the employee asserted that Lane "would go out to the lake and throw herself out to the men there." *Id.* Lane sued for $5,000, and a jury returned a verdict of $500 in her favor. *See id.* at 558–59.

Knoxville Traction asserted that the suit could not be maintained because it was "based solely upon injury to the feelings of the plaintiff." *Id.* at 560. The Court rejected this argument holding that Lane could recover damages for "injuries to her feelings and sensibilities." *Id.* The Court's decision relied, in part, on the contract of carriage between a common carrier and passenger which includes a duty that the former will protect the latter from insult or injury by its employees or third persons. *See id.* Thus, the Court characterized the gravamen of the action as breach of contract of carriage. *See id.* The Court's conclusion, however, that Knoxville Traction was "liable for the injury and insult willfully inflicted upon Mrs. Lane," *id.* at 560, illustrates the attempts of the judiciary to remedy intentional conduct within the narrow confines of then-existing law. *See also Hill v. Travelers' Ins. Co.,* 154 Tenn. 295, 294 S.W. 1097 (1927) (concluding plaintiff stated a cause of action for damages from grief, worry, and mental anguish caused by interference with plaintiff's right of possession of deceased spouse's body).

Despite the result in *Knoxville Traction* and other similar cases, recovery for emotional distress was still limited in that a plaintiff had to fit a claim within a pre-existing legal category or prove an accompanying physical injury. Restrictions on such claims were justified, in part, on grounds that mental injuries were "slight and unimportant" but even when mental injuries were "considerable, they [gave] no right of action, since the law is designed to

meet general conditions, and not exceptional cases." *Colsher v. Tennessee Elec. Power Co.,* 19 Tenn.App. 166, 84 S.W.2d 117, 125 (1935) (citing 3 L.R.A. 49). More significantly, the consequences of mental injuries were characterized as "so elusive in character and the means of testing the truth of the allegations so inadequate" that public policy militated against permitting recovery of damages. *Id.* at 126. As early as 1888, this Court conceded that the bases upon which it permitted claims for emotional distress were often no more than legal fictions. *See Wadsworth,* 8 S.W. at 576.[2] Nevertheless, Tennessee's common law retained devices including "legal fictions" and requirements of physical injury to distinguish actions based on emotional distress. Consequently, claims for purely emotional injuries that did not fit within traditional causes of action failed. *See, e.g., Bowers v. Colonial Stages Interstate Transit, Inc.,* 163 Tenn. 502, 43 S.W.2d 497 (1931), *modified by Camper v. Minor,* 915 S.W.2d 437 (Tenn.1996); *Memphis St. Ry. Co. v. Bernstein,* 137 Tenn. 637, 194 S.W. 902 (1917), *modified by Camper v. Minor,* 915 S.W.2d 437 (Tenn. 1996); *Knoxville, Cumberland Gap & Louisville R.R. Co. v. Wyrick,* 99 Tenn. 500, 42 S.W. 434 (1897); *All v. John Gerber Co.,* 36 Tenn.App. 134, 252 S.W.2d 138 (1952), *modified by Camper v. Minor,* 915 S.W.2d 437 (Tenn.1996); *Colsher,* 19 Tenn. App. 166, 84 S.W.2d 117.

This Court recognized the hardship this approach caused, and in *Medlin v. Allied Investment Co.,* 217 Tenn. 469, 398 S.W.2d 270 (1966), it examined "whether the law recognizes and protects a right to emotional tranquility where recovery is sought for mental or emotional disturbance alone." *Id.* at 273. In the context of intentional conduct, the Court concluded that a plaintiff does have a right to emotional tran-

**2.** In particular, the Court recognized actions for seduction of a wife or daughter as illustrative of this proposition. *See Wadsworth,* 8 S.W. at 576. The Court contended that "the main element of damage, the real injury sustained, is the wound to the feelings; the loss of service upon which the actions are technically based being but a legal fiction, and more imaginary than real." *Id.*

quility that, if violated, gives rise to an independent cause of action for intentional infliction of emotional distress. *See id.* at 273–74. The Court reached this conclusion by discarding the traditional arguments used to preclude claims for emotional distress,

First, the Court rejected the assertion that emotional injuries were unprovable. It recognized the inherent unfairness in a rule that allowed a plaintiff with a slight physical injury to recover damages for accompanying mental anguish, *see id.* at 273, while a plaintiff with only a mental injury was left without a remedy. The *Medlin* Court observed that recovery by a plaintiff falling within the former designation implies that a mental injury may be sufficiently proved to permit an award of damages. *See id.* Indeed, this Court rejected distinctions between mental and physical injury and concluded that "[m]ental suffering ... is no more difficult to prove and no harder to calculate in terms of money than the physical pain of a broken leg which has never been denied compensation." *Id.*

Second, the Court in *Medlin* dismissed the argument that mental injuries could not be adequately remedied by damages, because they were so intangible and peculiar to a particular individual that they could not be anticipated. *See id.* We acknowledged the view of medical science that emotional distress may well have physical consequences and agreed that such knowledge was possessed by the average person "who understands to some extent that [the consequences of emotional distress] are normal, rather than the unusual result of many types of conduct." *Id.* Thus, this Court "discarded foreseeability as the sole criterion of legal cause." *Id.*

Finally, the Court in *Medlin* addressed concerns that recognizing a cause of action for intentional infliction of emotional distress would lead to a host of trivial claims. The solution to these concerns was found in the requirements of section 46 of the Restatement (Second) of Torts, which provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm.

*Id.* at 274 (quoting Restatement (Second) of Torts § 46(1) (1965)).

By grounding the cause of action for intentional infliction of emotional distress within the Restatement framework, we limited recovery to those plaintiffs who could satisfy its requirements. In *Bain,* we had the occasion to clarify the requirements to establish a prima facie case of intentional infliction of emotional distress: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct must result in serious mental injury to the plaintiff. *See Bain,* 936 S.W.2d at 622. It is this third requirement that is the subject of this appeal and to which we now turn our attention.

## B. Majority and Minority Approaches to the Necessity of Expert Proof

In the brief history of the tort of intentional infliction of emotional distress, this Court has not examined whether expert testimony is required to establish the existence of a serious mental injury.[3] Other

---

3. The defendants contend that Tennessee's appellate courts "have consistently required expert or scientific medical proof for a plaintiff to recover for the tort of intentional infliction of emotional distress." This assertion is unsupported by the cases cited by the defendants. These cases are illustrative of nothing more than the kinds of evidence that may or may not sustain a claim of intentional inflic-

tion of emotional distress. *See, e.g., Blair v. Allied Maintenance Corp.,* 756 S.W.2d 267 (Tenn. Ct. App.1988); *Dunn v. Moto Photo, Inc.,* 828 S.W.2d 747 (Tenn. Ct. App.1991); *Johnson v. Woman's Hosp.,* 527 S.W.2d 133 (Tenn. Ct. App.1975); *Steele v. Superior Home Health Care of Chattanooga, Inc.,* No. 03A01–9709–CH–00395, 1998 WL 783348 (Tenn. Ct. App. Nov.10, 1998). Indeed, in some cases

courts, however, that have examined this issue have come to markedly different conclusions.

A minority of jurisdictions requires expert medical or scientific proof of serious mental injury to maintain a claim for intentional infliction of emotional distress. *See, e.g., Childs v. Williams,* 825 S.W.2d 4 (Mo.Ct.App.1992); *Kazatsky v. King David Mem'l Park, Inc.,* 515 Pa. 183, 527 A.2d 988 (1987); *Vallinoto v. DiSandro,* 688 A.2d 830 (R.I.1997). These courts reason that expert proof is necessary to prevent the tort from being reduced to a single element of outrageousness, so by requiring expert proof, the elements of outrageous conduct and serious mental injury remain distinct. *See Kazatsky,* 527 A.2d at 995. Moreover, courts expressing the minority view contend that because expert proof can be easily obtained, it must be used to prove serious mental injury. *See id.* ("Given the advanced state of medical science, it is unwise and unnecessary to permit recovery ... without expert medical confirmation that the plaintiff actually suffered the claimed distress."). These courts assert that due to the wide availability of expert proof, plaintiffs will encounter "little difficulty in procuring reliable testimony as to the nature and extent of their injuries." *Id.* at 995.

A majority of courts that have examined this issue, however, have concluded that expert proof is generally not necessary to establish the existence of a serious mental injury. *See, e.g., Richardson v. Fairbanks North Star Borough,* 705 P.2d 454 (Alaska 1985); *Latremore v. Latremore,* 584 A.2d 626 (Me.1990); *McKnight v. Simpson's Beauty Supply, Inc.,* 86 N.C.App. 451, 358 S.E.2d 107 (1987); *Uebelacker v. Cincom Sys. Inc.,* 48 Ohio App.3d 268, 549 N.E.2d 1210 (1988); *Chandler v. Denton,* 741 P.2d

855 (Okla.1987); *Peery v. Hanley,* 135 Or. App. 162, 897 P.2d 1189 (1995); *Brower v. Ackerley,* 88 Wash.App. 87, 943 P.2d 1141 (1997); *Tanner v. Rite Aid of W. Va., Inc.,* 194 W.Va. 643, 461 S.E.2d 149 (1995). The flagrant and outrageous nature of the defendant's conduct, according to these courts, adds weight to a plaintiff's claim and affords more assurance that the claim is serious. *See Brower,* 943 P.2d at 1149; *Tanner,* 461 S.E.2d at 161. Moreover, expert testimony is not essential because other reliable forms of evidence, including physical manifestations of distress and subjective testimony, are available. *See Chandler,* 741 P.2d at 867; *Peery,* 897 P.2d at 1191. Courts following the majority approach also contend that expert testimony is normally not necessary because a jury is generally capable of determining whether a claimant has sustained a serious mental injury as a proximate result of the intentional conduct of another person. *See McKnight,* 358 S.E.2d at 109. Additionally, courts expressing the majority view reason that the very nature of the tort of intentional infliction of emotional distress "makes it impossible to quantify damages mainly on expert medical evidence." *Chandler,* 741 P.2d at 867.

## C. *Adoption of Majority Approach*

We conclude that the majority approach is consistent with our precedents and the underlying policies governing the law of intentional infliction of emotional distress. As previously discussed, the Court in *Medlin* examined and rejected arguments traditionally used to justify limiting actions for mental distress. In *Medlin,* the Court dispensed with the first argument—nonrecognition of intentional infliction of emotional distress as an independent tort. After weighing the policy considerations for

cited by the defendants, claims failed despite the introduction of expert medical or scientific testimony suggesting that the standard to be satisfied is quite exacting. *See Pursell v. First Am. Nat'l Bank,* No. 01–A–01–9411–CV00513, 1995 WL 276825 (Tenn. Ct. App. May 12, 1995); *Schneibel v. Depew,* No.

03A01–90204CH00134, 1992 WL 221019 (Tenn. Ct. App. Sept. 15, 1992). Contrary to the defendants' contention, these decisions do not state, nor do they amount aggregately, to a rule requiring expert testimony to establish a claim for intentional infliction of emotional distress.

and against recognizing intentional infliction of emotional distress as an independent tort, this Court concluded that the purposes for permitting recovery for intentional infliction of emotional distress "outweigh[ ] the valid policy consideration against allowing such actions." *Medlin,* 398 S.W.2d at 274. Additionally, through our interpretation of intentional infliction of emotional distress, this Court has also rejected a second argument—the requirement of an accompanying physical injury. *See Medlin,* 398 S.W.2d at 273–74. The policy underlying development of the tort is that legitimate claims for emotional distress should be actionable and should be judged on their merits. With our decision today, we reject a third argument—the requirement of expert testimony. In so doing, we ensure that a plaintiff with a legitimate claim for intentional infliction of emotional distress will have an opportunity to seek redress for that claim, unburdened by the historical limits imposed by law.

The defendants argue that by permitting claims for intentional infliction of emotional distress to proceed without expert testimony, we will create inconsistency with regard to proving serious mental injuries. In *Camper v. Minor,* 915 S.W.2d 437, 446 (Tenn.1996), we held that a claimed injury or impairment caused by a defendant's negligent infliction of emotional distress "must be supported by expert medical or scientific proof." Accordingly, the defendants here contend that if we require expert medical or scientific proof for negligent infliction of emotional distress but not intentional infliction of emotional distress, "serious mental injury" will cease to have a unified meaning as a term of art. We disagree. Our decision does not change the definition of "serious mental injury," but it does distinguish between the methods of proof for the separate torts. This is so, because, although the injury sustained in both torts is the same, the circumstances surrounding the infliction of the injury are not.

We recognize that legitimate concerns of fraudulent and trivial claims are implicated when a plaintiff brings an action for a purely mental injury. Thus, safeguards are needed to ensure the reliability of claims for intentional and negligent infliction of emotional distress. These safeguards, however, differ based on the *kind of conduct,* rather than the kind of injury, for which a plaintiff seeks a remedy.

■ With regard to intentional infliction of emotional distress, the added measure of reliability, *i.e.,* the insurance against frivolous claims, is found in the plaintiff's burden to prove that the offending conduct was outrageous. This is an exacting standard requiring the plaintiff to show that the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965). Such conduct is "important evidence that the distress has existed," *id.* § 45 cmt. j, and from such conduct, more reliable indicia of a severe mental injury may arise. The outrageous nature of the conduct, therefore, vitiates the need for expert testimony in a claim for intentional infliction of emotional distress. The risk of frivolous litigation, then, is alleviated in claims for intentional infliction of emotional distress by the requirement that a plaintiff prove that the offending conduct was so outrageous that it is not tolerated by a civilized society.

■ In cases of negligent infliction of emotional distress, however, the conduct giving rise to the tort is not marked by extraordinary or outrageous elements inherent in intentional conduct. Thus, concerns with unwarranted claims are not addressed by the kind of conduct that must be proved to obtain damages for emotional distress. In the absence of any reliable indicia of a severe mental injury suggested by the conduct, some safeguard must be imposed to limit frivolous litigation. Accordingly, when the conduct complained of

is negligent rather than intentional, the plaintiff must prove the serious mental injury by expert medical or scientific proof. *See Camper*, 915 S.W.2d at 446.

▉ ˙ Although we adopt the majority approach and hold that plaintiffs normally will not be required to support their claims of serious mental injury by expert proof in order to recover damages in a suit based upon the intentional infliction of emotional distress, we certainly do not discredit the use of expert testimony at trial. We are fully aware that there will be many cases in which a judge or jury may not appreciate the full extent and disabling effects of a plaintiff's emotional injury without expert evidence. For example, our decision in no way changes the long-standing requirement that expert testimony is required to support an award of damages for personal injuries that are permanent in character. *See, e.g., Sanders v. Johnson*, 859 S.W.2d 329, 331 (Tenn. Ct. App.1993); *Porter v. Green*, 745 S.W.2d 874, 877–78 (Tenn. Ct. App.1987).

▉ Our decision today merely recognizes that in most cases other forms of proof may also be used to establish a claim for intentional infliction of emotional distress. Such proof may include a claimant's own testimony, *see Peery*, 897 P.2d at 1191, as well as the testimony of other lay witnesses acquainted with the claimant, *see Uebelacker*, 549 N.E.2d at 1220. Physical manifestations of emotional distress may also serve as proof of serious mental injury. Moreover, evidence that a plaintiff has suffered from nightmares, insomnia, and depression or has sought psychiatric treatment may support a claim of a serious mental injury. *See Medlin*, 398 S.W.2d at 272; *Johnson v. Woman's Hosp.*, 527

S.W.2d 133, 140 (Tenn. Ct. App.1975). The intensity and duration of the mental distress are also factors that may be considered in determining the severity of the injury.[4]

▉ Such proof, however, is no guarantee that a plaintiff will prevail. The weight, faith, and credibility afforded to any witness's testimony lies in the first instance with the trier of fact who is free to conclude that the subjective testimony of a plaintiff or other lay witnesses is not sufficient to prove a serious mental injury. Thus, although not legally required, "[e]xpert testimony may be the most effective method of demonstrating the existence of severe emotional distress." *Richardson*, 705 P.2d at 457 n. 6.

### D. Consistency with Law Governing Expert Testimony

▉ Our decision is also consistent with the law governing the required use of expert testimony. The mere availability of expert proof does not give rise to a corresponding obligation that it be used. Rather, expert testimony is necessary only when the subject of examination requires knowledge or experience that persons lacking special skills do not have and that cannot be obtained from ordinary witnesses. *See Lawrence County Bank v. Riddle*, 621 S.W.2d 735, 737 (Tenn.1981). If the finder of fact can comprehend the subject of expertise without expert testimony, then an expert witness is not necessary. *See id.*

▉ The Restatement (Second) of Torts, the framework for intentional infliction of emotional distress in Tennessee, couches the tort in terms indicating that

---

4. Although the plaintiff is generally not required to present expert testimony to validate the existence or severity of a mental injury, we emphasize that the evidence must establish that the plaintiff's mental injury is serious or severe.

> It is only where [the mental injury] is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress is so severe that no reasonable [person] could be expected to endure it.

Restatement (Second) of Torts § 46 cmt. j (1965).

expert testimony should not be required. Pursuant to the Restatement, the tort typically exists when "the recitation of the facts [of a commission of the tort] to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" Restatement (Second) of Torts § 46 cmt. d (1965). The kinds of emotional distress that may be remedied include "fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." Restatement (Second) of Torts § 46 cmt. j (1965). Such emotional responses are not so esoteric that they occupy a dimension beyond the cognitive grasp of the average layperson and are therefore accessible only to the expert. *See, e.g., Chandler,* 741 P.2d at 867 ("In most cases, jurors from their own experience are aware of the extent and character of the disagreeable emotions that may result from a defendant's outrageous conduct."). Accordingly, we conclude that the trier of fact can normally ascertain the existence of a serious mental injury caused by the intentional infliction of emotional distress, thus obviating the necessity of expert proof.

## CONCLUSION

 In summary, we hold that expert medical or scientific proof of a serious mental injury is generally not required to maintain a claim for intentional infliction of emotional distress. Accordingly, we reverse the judgments of the trial court and the Court of Appeals and remand to the trial court for further proceedings.

Costs of this appeal are taxed to the Appellees.

ANDERSON, C.J., DROWOTA, BIRCH, and HOLDER, J.J., concur.