IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 2004 Session

## CARL SHOCKLEY, ET AL. v. JOSEPH F. CROSBY, ET AL.

Appeal from the Circuit Court for Van Buren County
No. 1218-C     Larry B. Stanley, Jr., Judge

No. M2003-00794-COA-R3-CV - Filed September 21, 2004

This appeal arises from a claim filed in Van Buren County Circuit Court alleging breach of contract, outrageous conduct, and assault. At the close of the plaintiff's proof, the trial court granted the defendants' motion for a directed verdict on the outrageous conduct claim. At the close of all the proof, the trial court granted the plaintiff's motion for a directed verdict on the breach of contract claim, and the parties then stipulated that the assault had occurred. The case went to the jury for consideration of the damages resulting from the breach and the assault. The jury returned a verdict of $57,500 for the breach of contract and specifically found that the assault did not cause injury to Carl Shockley for which compensatory damages should be awarded. Nonetheless the jury did find that Joseph Crosby acted in such a way that punitive damages should be awarded. The trial court refused to submit the punitive damages issue to the jury and granted a remittitur of $7,500 on the contract claim. Both parties appeal. We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Affirmed and Remanded

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

Michael P. Mills and Aaron J. Conklin, Nashville, Tennessee, for the appellant, Carl Shockley, d/b/a Shockley-Conner Logging and Shockley Logging.

Thomas A. Greer, Jr., Dunlap, Tennessee and J. Hilton Conger, Smithville, Tennessee, for the appellees, Joseph F. Crosby and Opal M. Crosby.

### OPINION

The parties to this appeal entered into a logging contract whereby Shockley-Conner [Shockley] Logging would cut and haul timber from Crosby's multi-acre tract in Van Buren County. Carl Shockley and Joe Crosby were introduced by an intermediary and mutual friend R. J. Bowling, who noticed Shockley's industrious nature and the potential in his friend Joseph Crosby's prime

timber and sought to facilitate a working relationship between the two. Unfortunately the business relationship did not go as Mr. Bowling had hoped.

Mr. Crosby and Carl Shockley, with his partner at the time J. C. Conner, entered into the logging contract on May 19, 2000. Pursuant to the terms of this contract Shockley agreed to "thin merchantable hardwood and pine timber, to cut all Virginia pine and 60% yellow pine leaving 25 to 26 hardwood trees per acre." Crosby and Shockley were to divide the proceeds on all timber except for hardwood and pulpwood on a two to one ratio. For the hardwood and pulpwood Crosby was to receive $3 per ton of timber processed. The contract specifically provided:

### 9. LIABILITY
LANDOWNER/TIMBER OWNER shall in no way be liable or responsible for any injury or damage done or occasioned by the action and operations of CONTRACTOR under this agreement, and CONTRACTOR binds and obligates itself to pay and satisfy any and all claims arising on account of its employees or other persons, or damage to any type of property, and CONTRACTOR further agrees to indemnify and hold harmless from against any and all liability, claims, loss injury or damage that is caused in whole or part by the negligence of its agents and employees.

. . .

### 13. NON-TERMINATION OF LANDOWNER/TIMBER OWNER
LANDOWNER/TIMBER OWNER shall not terminate or attempt to terminate this Contract, or otherwise attempt to stop CONTRACTOR from cutting or converting timber which is subject to this contract after CONTRACTOR has begun work until all timber designated above has been cut and converted, unless CONTRACTOR is not following the cutting agreement of leaving proper number of trees per acre as stipulated by LANDOWNER/TIMBER OWNER and leaving tops trimmed flat on ground.

The term of the contract was to be four years. The tract of land was in excess of 800 acres. Shockley's undisputed testimony at trial showed that during the course of performance Crosby frequently directed the cutting of underbrush and resizing of stumps. The net effect of Crosby's actions arguably increased the burden upon Shockley to perform under the contract. Nonetheless Shockley continued to log the property with the help of subcontractors including his brother Donny Shockley. This increasingly difficult relationship culminated in an incident on November 5, 2001, which served as the basis for Shockley's complaint in Van Buren County Circuit Court.

Immediately prior to November 5, Crosby had voiced concern about the lack of liability insurance covering trucks in Shockley's service. In fact, Crosby had confronted Shockley on at least two occasions, the last being the November 5 incident. Donny Shockley describes the incident thus:

-2-

Q.     Had Mr. Crosby come back to the back of the property before you got loaded?

A.     Yeah.

Q.     All right.  And what happened then when he came back to the back of the property?

A.     Well, he had told Carl that there wasn't going to be no loads go out of there and he basically was just going to shut him down, you know.

Q.     Did he say why?

A.     Well, when he spoke to me, I told him he would have to talk with Carl, you know.  But it was because like I didn't have no insurance on my truck.

Q.     Okay.  Were you aware of any rule or law that required you to have insurance on your logging truck at that time?

A.     There weren't none.

Q.     Were you aware of any contractual provisions between you and Carl Shockley that you have insurance?

A.     No.

Q.     Did you work for Carl as far as your hauling, or did you work for Mr. Crosby?

A.     I worked for Carl.

Q.     You never had any direct dealing as far as Mr. Crosby?

A.     No.

Q.     He didn't pay you?

A.     No.

Q.     After Mr. Crosby came to the back of the property while ya'll were loading and said there wasn't going to be any more hauling off there that day, what did ya'll do?

A.     Well, Carl, he told me to haul it out of there, you know, take the load out, and that's what I did.  I was working for him.

Q.     And did you head towards the front of the property?

A.     Yes.

Q.     Which road were you heading towards?  Which highway?

A.     I was heading to 111.

Q.     All right.  And did you get there?

A.     No.

Q.     What happened before you got there?

A.     Mr. Crosby stopped me and blocked the road.

Q.     How did he block the road?

A.     He pulled the truck crossways with a trailer behind it and then just got out of the truck with the gun.  He just had - - you know, he was pointing at me.  So I called Carl on the radio, CB, told him what was happening.  And Carl told me just get out of the truck and he would be right there.

Q.     Did you say anything to Mr. Crosby while you were waiting?

A.     No.

Q. Did he say anything else to you?
A. He just told me I wasn't going to take that truck out of there.
Q. Did you threaten him in any way?
A. No.
Q. Did you move like you were going to hit him?
A. No.
Q. Did you grab a gun?
A. No.
Q. A knife?
A. No.
Q. Pick up a stick, anything?
A. I froze.
Q. Okay. How long was it before Carl came up?
A. Probably just minutes.

. . . .

Q. And did ya'll leave?
A. Yes.
Q. All right. Did you leave your truck there?
A. Yes.
Q. Loaded?
A. Yes, it was loaded.
Q. Did ya'll get it back later?
A. Later we did, yes.
Q. Mr. Crosby let you go get it?
A. Yes.
Q. All right. You hauled it on out of there then?
A. Yeah.
Q. Did you ever talk to Mr. Crosby after that?
A. Huh-uh (negative).
Q. How did Mr. Crosby look when he was standing there holding that gun?
A. He looked scared, you know, or shook up. I was pretty scared myself.

His version tracks fairly closely to that given by the plaintiff in his testimony:

Q. Are we on November 5, 2001 now?
A. Yes.
Q. Last day?
A. Last day.
Q. What happened?

-4-

A. He come up with a little guy. I can't remember his name. I can't remember. I always called him little bald-headed guy. You know, not meaning no disrespect.

Q. I didn't take any. I've got a little left.

A. Anyhow, he was leaned over on the hood, and Joe got out of his truck and come over there, and I was loading the truck. And I shut the knuckleboom off. Joe said: I told you, you ain't taking another truck out of here without insurance - - or that truck. It may have been that truck, I'm not sure about that.

I said, Joe, I've got a contract to fill, and I got bills. And I said, now - - I don't know if this is exactly the way I worded it, but anyhow, I told him to either get a court order or the law to put me out of there.

And he said, I've got your court order at the gate. But there ain't no gate anywhere on that property.

Q. What was he talking about with the gate, did you know?

A. I figured he was going to have the law there, is what I figured.

Q. Out at the front of the property?

A. Yes, sir.

Q. What was your understanding about the conversations that had gone on before that between the lawyers?

A. To my knowledge, I had the right to keep right on working. That's what you told me.

Q. Go ahead from there then.

A. Donny went out with the truck. We finished loading it. I don't know, it was fifteen minutes, I guess. It was maybe a little longer, maybe a few minutes less. Donny went out, and the next thing I know, I heard the radio, CB radio saying: You better come over here.

Q. It was Donny?

A. Yes.

Q. Okay.

A. So me and Toby just got in the truck and drove over there.

. . . .

Q. Okay.

A. And when we pulled up and Donny was setting in the road, we kindly pulled over to the side of the back of Donny's truck where we could see. And Joe was standing there with a gun on Donny. And Donny was standing in front of the truck.

Q. How was Mr. Crosby holding the gun?

A. This (indicating). Not like this (indicating). But like that (indicating), with the barrel towards Donny.

Q. And you and Toby got out of the truck?

A. Yes.

Q.      What happened next?

A.      I walked up there, you know, and I thought maybe he was kidding or something, you know. And I said: Joe, you mean you are going to pull a gun on me. He turned around toward me and Toby. And to me it looked like the barrel was right towards me. And he said: I already have.

Q.      What did you say?

A.      I didn't say nothing.

Q.      How did you feel?

A.      I don't know, not good.

Q.      Were you scared?

A.      I would say probably so. He was sure red-faced.

Shockley further explains his state of mind resulting from this confrontation on cross-examination:

Q.      You told Mr. Mills a while ago when he asked you, how did you feel? You said, I don't know. You don't know how you felt?

A.      Kindly weak kneed.

Q.      And when you left - - where did you go when you left?

A.      I went and called Mr. Mills.

Q.      So you didn't call the sheriff's department?

A.      No, sir.

Q.      Didn't come out here and file a report about it?

A.      No, sir.

Q.      Were you at home when you called Mr. Mills?

A.      I went straight home.

Q.      Did you go to a doctor?

A.      No, sir, not then.

Q.      Well, have you seen a psychiatrist?

A.      No.

Q.      Have you seen a psychologist?

A.      I don't know what one of them is.

Q.      Had any counseling because of this incident?

A.      No, sir.

Q.      Hadn't seen a mental health counselor or anything because of this?

A.      No, sir.

Q.      Taking any medication because of it?

A.      No, sir.

Q.      Have you seen a doctor because of this?

A.      I don't know if it'd be because of that or not.

Q.      Did you start another job shortly after this?

A.      It was - - well, from then until right around December, the middle of December, the 15th or 16th, I guess.

Q.      So you were able to go back to work?

> A.     After a while, yes.
>
> Q.     Well, it wasn't because you had a gun pointed at you that you weren't able to work, was it, Mr. Shockley?
>
> A.     No.
>
> Q.     Just didn't have something else to go to right then?
>
> A.     Just kindly set around the house.
>
> Q.     But it wasn't because of this incident, was it?
>
> A.     Probably not.

In addition to the claim for outrageous conduct and assault, the plaintiff provided an involved estimation of damages suffered by Crosby's breach of the contract. The result of that equation given on direct testimony was an estimate of $122,000 in damages, which would translate to $61,000 of net profit per year remaining in the contract term. Excerpts of the plaintiff's tax returns on file as Exhibits 6 and 7 to the testimony do not support this estimate. Exhibit 6, Plaintiff Carl Shockley's Schedule C from the 1040 Form for tax year 2000, claims gross receipts of $28,323. The Schedule C form representing tax year 2001 shows gross receipts of $50,786. In addition to these alternative amounts, the plaintiff testified that as a result of Crosby's breach he suffered the repossession of a piece of lumber equipment:

> Q.     Now you talked about some of the equipment you bought too. Did you lose some of your equipment?
>
> A.     Yes, sir, I did.
>
> Q.     What did you lose?
>
> A.     I lost a cutter, sheerer.
>
> Q.     Is that what you bought from Mr. Prater?
>
> A.     No, Mr. Neece.
>
> Q.     And how much did you say you paid for the cutter?
>
> A.     Seventeen thousand dollars.
>
> Q.     You paid seventeen for the cutter?
>
> A.     Yes.
>
> Q.     Seventeen thousand dollars for the cutter, and how much had you paid on it?
>
> A.     Seventy-five hundred.
>
> Q.     What happened to the cutter?
>
> A.     Well, I was off work and didn't have no work from the time he shut me down from the 15th of December and couldn't make the payments on the five hundred a week.
>
> The man called me and said either catch your payments up or bring it back. So I took it back.
>
> Q.     Do you know what he did with it?
>
> A.     He sold it.
>
> Q.     Did you have to pay any more money after that?
>
> A.     No.

Q.     Did you get seventy-five hundred dollars back?
A.     No.
Q.     Did you get the cutter back?
A.     No.
Q.     You just lost that?
A.     Right.

For his part the defendant Crosby put on two witnesses.  The first one, Don Sullivan worked for Carl Shockley for two months from June to July of 2000.  The second, Winton Humble ran a mid-sized lumber operation in Van Buren County.  The proof at trial showed that Humble, Shockley, and Crosby entered into another agreement regarding Crosby's property which provided:

This agreement is between Carl Shockley Logging (Carl Shockley owner) and Winton Humble Logging (Winton Humble owner).
This agreement is that Carl Shockley agrees to allow Humble Logging to continuously log the Crosby Farm and in return Humble Logging agrees to cut logs for Shockley Logging at no cost to Shockley.  The log cutting to be done by machine and to the specification (as low to the ground as feasability possible) as in the original contract with Shockley.  This agreement will be binding to both parties after signing and approval of the owner of Crosby Farms, Joseph F. Crosby.

Humble testified that this agreement was entered into in January of 2001, and that prior to that time only 75 acres of the 800+ acre tract had been logged.  In addition and as a result of this agreement, by June of 2001, 400 acres of the tract had been logged.  He offered the following testimony regarding the plaintiff's estimate of his damages resulting from the breach:

Q.     Is there any way that a man of your experience could set here today and estimate what he is going to make out of that tract of timber, accurately estimate?
A.     No way.
Q.     Why?
A.     Market fluctuations and you don't know what you are going to have to spend on road maintenance or road building, or anything else to get the remaining timber out.  But timber prices fluctuate three times a year, Spring, Summer, and Fall.  There are there totally different timber prices.
Q.     Do expenses fluctuate?
A.     Sure.  You don't never know when you are going to blow up an engine in the skidder or knuckleboom or bust a tire on a skidder.
Q.     Do fuel costs fluctuate?
A.     Yes, not as much as the other stuff, you know.  It's fifty cents a gallon on fuel, and just depending on what you burn, you know.
Q.     Mr. Shockley here has estimated that he would have a profit out of that two hundred twenty-five acres of timber of one hundred twenty-two thousand

dollars, profit to him.  Is there any way you can set here today and estimate that, accurately estimate that?

A.     I couldn't.  I don't know anybody else that could.

Prior to putting on these witnesses the defendant Crosby moved for a directed verdict as to the assault claim and the outrageous conduct claim, based on the plaintiff's failure to prove that he suffered serious or severe emotional injury as a result of the conduct of the defendant.  In addition, the defendant moved for directed verdict on the lost profits claim resulting from the breach of contract allegation on the ground that the proof was too speculative in nature.  The court granted a directed verdict on the outrageous conduct claim only, and the proof continued.  At the close of all the proof, the plaintiff moved for a directed verdict as to the breach of contract, at which point the following exchange took place:

THE COURT: Defense would agree that there was an assault and that the contract was breached, and it's just a matter of the damages of the damages arising from those two instances?

MR. CONGER: That's right.

THE COURT: That leaves us with the issues just of the assault, the amount of damages, and contract amount of damages.  Gentlemen, do you have jury instructions that you request the Court to issue?  I have a list.

MR. CONGER: Yes, sir.

After receiving instructions from the bench the jury deliberated on the issues of damages resulting from the breach and the assault and rendered the following verdict:

The jury having heard the evidence and arguments of counsel, deliberated and found as follows:

1.     The assault by Joseph Crosby did not cause injury to Carl Shockley for which compensatory damages should be awarded;

2.     Carl Shockley should be awarded $57,500.00 for the breach of contract; and

3.     Joseph Crosby did act in such a way that punitive damages should be awarded.

The Court, after hearing arguments of counsel, held that punitive damages could not be awarded in that the jury did not award compensatory damages for the assault and found that the facts surrounding the breach of contract did not fall within the exceptions allowing punitive damages for breach of contract:

It is, therefore, ORDERED, ADJUDGED AND DECREED that Judgment be entered in favor of Carl Shockley, d/b/a Shockley-Conner Logging and Shockley Logging in the amount of $57,500.00.  The costs are assessed against the Defendants Joseph F. Crosby and Opal M. Crosby for which execution may issue if necessary.

On the defendant's motion for a remittitur or in the alternative for new trial, the court suggested a remittitur of $7,500 finding in pertinent part:

> The issue raised in paragraph three of the Defendants' motion is well-taken. It appears from the transcript that under the original contract there was no discussion about the Plaintiff being required to use a cutter to remove the trees from the Defendants' property. It was the Plaintiff's testimony that months into the contract the Defendant requested and/or stated that the Plaintiff should use a cutter instead of a chainsaw to remove the trees. Plaintiff had the opportunity at that point to seek assistance from the Court if he felt this was a breach of the original contract. However, it was not proven that the Plaintiff would have been prohibited from logging the trees with a chainsaw, although that appeared to be the Defendants' indication. It is unknown whether the Defendants would have allowed the Plaintiff to complete the contract with chainsaws as he had begun. Therefore, the jury's verdict stands as rendered with the exception that their award of $57,500.00 to the Plaintiff is reduced by the sum of $7,500.00, for a total award of $50,000.00.

The defendant also moved for a new trial alleging that one of the juror members, Don DeWayne Shockley, was related to the plaintiff within the sixth degree and thus disqualified to act as a juror pursuant to Tennessee Code Annotated section 22-1-105. The court denied this portion of the defendant's motion for a new trial holding in part:

> As to the issue of juror Don DeWayne Shockley's relationship to the Plaintiff's sister, it is hereby found that: (1) this Court has determined that the juror in question was not related to the Plaintiff within the sixth degree of civil kinship; and (2) even if the party was within the sixth degree of civil kinship, it was harmless for juror Shockley to sit on this particular trial. Therefore, the Defendants' motion for new trial on the grounds set out in paragraph four is overruled.

Both parties appeal the order of the trial court raising separate issues on appeal. Appellant Carl Shockley challenges the entry of the directed verdict as to the outrageous conduct, the refusal of the trial court to allow the jury to consider punitive damages for assault, the refusal of the trial court to instruct and allow the jury to consider punitive damages for breach of contract, and the order of the court suggesting a remittitur of $7,500 on the defendant's motion. The Cross-Appellants Crosby challenge the verdict of the jury as contrary to the weight of the evidence. They urge on appeal that the plaintiff's proof as to the lost profits claim is too speculative and remote to sustain the jury verdict. Cross-Appellants also argue that juror Don DeWayne Shockley was related to the plaintiff within the sixth degree by marriage under Tennessee Code Annotated section 22-1-105, and that the juror's failure to disclose his relationship and the court's subsequent failure to exclude juror Shockley operates to vitiate the jury's verdict.

I.     Outrageous Conduct

The Tennessee Supreme Court has held:

> As early as 1888, this Court conceded that the bases upon which it permitted claims for emotional distress were often no more than legal fictions. *See Wadsworth*, 8 S.W. at 576. Nevertheless, Tennessee's common law retained devices including "legal fictions" and requirements of physical injury to distinguish actions based on emotional distress. Consequently, claims for purely emotional injuries that did not fit within traditional causes of action failed. *See, e.g., Bowers v. Colonial Stages Interstate Transit, Inc.*, 163 Tenn. 502, 43 S.W.2d 497 (1931), *modified by Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996); *Memphis St. Ry. Co. v. Bernstein*, 137 Tenn. 637, 194 S.W.902 (1917), *modified by Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996); *Knoxville, Cumberland Gap & Louisville R.R. Co. v. Wyrick*, 99 Tenn. 500, 42 S.W. 434 (1897); *All v. John Gerber Co.*, 36 Tenn. App. 134, 252 S.W.2d 138 (1952), *modified by Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996); *Colsher*, 19 Tenn. App. 166, 84 S.W.2d 117. This court recognized the hardship this approach caused, and in *Medlin v. Allied Investment Co.*, 217 Tenn. 469, 398 S.W.2d 270 (1966), it examined "whether the law recognizes and protects a right to emotional tranquility where recovery is sought for mental or emotional disturbance alone." *Id.* at 273. In the context of intentional conduct, the Court concluded that a plaintiff does have a right to emotional tranquility that, if violated, gives rise to an independent cause of action for intentional infliction of emotional distress. *See id.* at 273-74.

> . . . .

> [T]he Court in *Medlin* addressed concerns that recognizing a cause of action for intentional infliction of emotional distress would lead to a host of trivial claims. The solution to these concerns was found in the requirements of section 46 of the Restatement (Second) of Torts, which provides:
> > One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm.
> *Id.* at 274 (quoting Restatement (Second) of Torts § 46(1) (1965)).
> By grounding the cause of action for intentional infliction of emotional distress within the Restatement framework, we limited recovery to those plaintiffs who could satisfy its requirements. In *Bain*, we had the occasion to clarify the requirements to establish a prima facie case of intentional infliction of emotional distress; (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct must result in serious mental injury to the plaintiff. *See Bain*, 936 S.W.2d at 622.

*Miller v. Willbanks*, 8 S.W.3d 607, 611-12 (Tenn. 1999).

The undisputed proof at trial shows that the plaintiff Carl Shockley did not seek any psychiatric treatment of any kind, nor did he lose any sleep from the incident. He lost no work other than the lost work as a result of the breach. He did not seek medical attention. The sum and substance of his testimony was that upon being confronted at gun point he was "kindly weak-kneed." Contrary to counsel's statement at oral argument that such testimony would be the closest anyone from Van Buren County would come to saying "they were scared to death," Plaintiff did not so testify and no other evidence is offered that would militate against the application of the general rule relative to serious mental injury.

As the Supreme Court stated in *Miller*:

> Our decision today merely recognizes that in most cases other forms of proof may also be used to establish a claim for intentional infliction of emotional distress. Such proof may include a claimant's own testimony, *see Peery*, 897 P.2d at 1191, as well as the testimony of other lay witnesses acquainted with the claimant, *see Uebelacker*, 549 N.E.2d at 1220. Physical manifestations of emotional distress may also serve as proof of serious mental injury. Moreover, evidence that a plaintiff has suffered from nightmares, insomnia, and depression or has sought psychiatric treatment may support a claim of a serious mental injury. *See Medlin*, 398 S.W.2d at 272; *Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 140 (Tenn.Ct.App. 1975). The intensity and duration of the mental distress are also factors that may be considered in determining the severity of the injury. [FN4]
>
>> FN4. Although the plaintiff is generally not required to present expert testimony to validate the existence or severity of a mental injury, we emphasize that the evidence must establish that the plaintiff's mental injury is serious or severe. It is only where [the mental injury] is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress is so severe that no reasonable [person] could be expected to endure it. Restatement (Second) of Torts § 46 cmt. j (1965).

*Miller v. Willbanks*, 8 S.W.3d at 615.

While any person might have experienced emotional distress if placed in the plaintiff's position, the trial court was presented with no proof of severe emotional injury. Under the circumstances the directed verdict in that respect is affirmed.

II.     Punitive Damages for Assault

Appellant's second issue involves the trial court's refusal to submit the cause for bifurcated consideration of punitive damages pursuant to *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992).

> In a trial where punitive damages are sought, the court, upon motion of defendant, shall bifurcate the trial. During the first phase, the factfinder shall determine (1) liability for, and the amount of, compensatory damages and (2) liability for punitive damages in accordance with the standards announced above. During this phase, evidence of a defendant's financial affairs, financial condition, or net worth is not admissible.
> If the factfinder finds a defendant liable for punitive damages, the count of such damages shall then be determined in an immediate, separate proceeding.

*Hodges*, 833 S.W.2d at 901.

After its deliberation the jury specifically found:

1.      The assault by Joseph Crosby did not cause injury to Carl Shockley for which compensatory damages should be awarded;
2.      Carl Shockley should be awarded $57,500.00 for the breach of contract; and
3.      Joseph Crosby did act in such a way that punitive damages should be awarded.

The general rule followed in this jurisdiction was enunciated in the case of *Allen v. Melton*, 20 Tenn. App. 387, 99 S.W.2d 219 (1936):

> In Tennessee, and in a large majority of the other states of the Union, exemplary, or punitive, damages, as a warning to other wrongdoers and as a punishment to the defendant, may be recovered *in addition to compensatory damages*. Sedgwick on Damages (9th.Ed.) vol. 1, § 360, p. 706; *Polk v. Fancher*, 1 Head, 336, 340; *Cox v. Crumley*, 5 Lea, 529, 533; *Louisville, etc., R.R. Co. v. Guinan*, 11 Lea, 98, 102, 47 Am. Rep. 279; *Hostetter v. Vaden*, 13 Tenn. App. 454, 456.
> The soundness of the doctrine under which exemplary damages may be allowed was doubted in the case of *Dougherty v. Shown*, 1 Heisk, 302, 305, 306; but it was maintained in that case under the rule of stare decisis, and it has since been regarded as the settled law of this state. See cases cited, supra.
> But "actual damage must be found as a predicate for the recovery of exemplary damages." Sutherland on Damages (3d.Ed.) vol. 2, § 406, p. 1129.

*Allen*, 20 Tenn. App. at 397, 99 S.W.2d at 225.

The rule was recently reiterated in *Roy v. Diamond*, 16 S.W.3d 783, 791 (Tenn.Ct.App. 1999). Tennessee follows the majority rule in American jurisdictions that actual damages must be

awarded by the trier of fact before any award of punitive damages can be made. The marked division of authorities among the states is recognized by Justice Henry in *Whittington v. Grand Valley Lakes, Inc.*, 547 S.W.2d 241, 243 (Tenn. 1977):

> This rule was first fully developed in Tennessee in the landmark case of *Allen, et al. v. Melton*, 20 Tenn. App. 387, 99 S.W.2d 219 (1936), wherein the late Judge Faw, with characteristic clarity, discussed the matter in some detail, citing numerous authorities and cases. This general rule was followed in *Liberty Mutual Ins. v. Stevenson*, 212 Tenn. 178, 368 S.W.2d 760 (1963), wherein the Court held that to sustain an award of punitive damages, actual damages must have been *awarded.*
>
> In *Lazenby v. Universal Underwriters Insurance Co.*, 214 Tenn. 639, 383 S.W.2d 1 (1964) the Court held that punitive damages are allowed only after an *award* of compensatory damages.
>
> *Lazenby* was followed by the Sixth Circuit, applying Tennessee law, in *Dill v. Greyhound Corporation*, 435 F.2d 231 (6th Cir. 1970).
>
> The courts of Tennessee appear to follow the majority rule although a small number of jurisdictions allow punitive damages as an independent basis of recovery, and a number of states have held that the plaintiff must have received injuries entitling him to compensation, although no actual award of compensatory damages were made. A substantial number of jurisdictions recognize nominal damages as a proper predicate. See Annotation, 17 A.L.R.2d 527, actual damages as a necessary predicate of punitive damages.
>
> The underlying consideration seems to be that there must be some actual loss supported by proof. We do not at this time and in this case feel any need to alter, erode or modify prior Tennessee case law. Here, actual damages were clearly demonstrated.
>
> . . . .
>
> There is proof in the record from which the jury might have found, as it obviously did, that Grand Valley Lakes ran rough-shod over rights of this landowner - - that its acts were in knowing, wilful and deliberate disregard of her property rights and that Grand Valley should therefore pay punitive damages.

*Whittington v. Grand Valley Lakes, Inc.*, 547 S.W.2d 241, 243 (Tenn. 1977).

Liability and resulting damages are distinct elements of the right of action in tort and without proof of both elements a plaintiff establishes no cause of action. *Skoretz v. Cowden*, 707 S.W.2d 529 (Tenn.Ct.App. 1985). Proof of all of the elements of proximate negligence without proof that is satisfactory to the trier of fact that the plaintiff has suffered some damages from the proximate negligence of the defendant results in the failure of the plaintiff's alleged cause of action because damages are an indispensable element of a tort claim. *Morris v. State*, 21 S.W.3d 196, 203 (Tenn.

Ct.App. 1999).[1]

In this case Shockley has recovered a judgment for compensatory damages in breach of contract. A verdict was directed for him on the issue of liability in tort for the assault. The case was then submitted to the jury under proper instructions to determine damages if any that were suffered by Shockley as a result of the assault. The jury returned a verdict of "$0" as damages for the assault. The trial court thereupon quite correctly refused to submit any issue of punitive damages to the jury.

A clearly analogous case applying the majority rule as to punitive damages is *Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742 (Tex. 1986). In that case plaintiff sued one of his seven insurors for breach of contract relative to a fire loss. He also sued this insuror for tortious interference with other contracts of insurance alleging damages in tort. The jury returned a verdict for breach of contract in the amount of $300,964. In answer to the interrogatory relative to the tort claim the jury made specific findings of fact that established all of the elements of tortious interference except for actual damages and as to that interrogatory the jury answered "none." Then without specifying whether its award was on the breach of contract claim or the tortious interference claim the jury awarded $1,000,000 punitive damages against the defendant. On appeal the Court of Appeals of Texas acknowledged that the punitive damage award could not be assessed for breach of contract but that in spite of the verdict of the jury awarding no actual damages the punitive damage award could be upheld on the tort count stating:

> . . . Brown suffered actual damages because the Telex caused at least
> one insurance company to refuse to pay his claim within the period
> designated in the policy, thus unnecessarily delaying the payment of
> funds necessary for the restart of his business. Brown was forced to
> sell personal property and raise the necessary funds by other means.
> 663 S.W.2d at 573.

704 S.W.2d at 744.

The Supreme Court of Texas reversed the punitive damage award holding:

> Comparing the above quote with what the jury actually found as damages
> reveals that the court of appeals has implied a finding of actual damages in tort not
> made in the trial court. The only actual damages found by the jury are in answer to

[1] The discussion by this court of this rule in *Emerson v. Garner*, 732 S.W.2d 613 (Tenn.Ct.App. 1987) starts with the general observation that "normally in tort law there must be some injury resulting in nominal damages at least before punitive damages can be assessed." 732 S.W.2d at 614. (emphasis added) (the word "nominal" is apparently inadvertent and should read "actual." The quote as it is written is inconsistent with the authority cited in the opinion holding that "actual damage must be found as a predicate for the recovery of exemplary damages," which is taken from *Allen v. Melton*, 20 Tenn.App. 387, 99 S.W.2d 219 (Tenn.Ct.App. 1936) and from *Whittington v. Grand Valley Lakes, Inc.*, 547 S.W.2d 241 (Tenn. 1977). The discussion in both *Allen* and *Whittington* makes it clear that in Tennessee and by the majority rule nominal damages are not a sufficient basis upon which a punitive damage award may be made.

-15-

Special Issue 22(1) and relate to Brown's breach of contract claim. The jury found no actual damages in tort. In answer to Special Issue 22(2), the only issue bearing on Brown's tort claim, the jury found that any delay in the payment of insurance proceeds caused Brown no loss of profits.

Findings of fact are the exclusive province of the jury and/or trial court. *Wisdom v. Smith*, 146 Tex. 420, 209 S.W.2d 164, 166 (1948); *Mooers v. Richardson Petroleum Co.*, 146 Tex. 174, 204 S.W.2d 606, 608 (1947). A court of appeals exceeds its authority when it implies a finding of actual damages in tort because a court of appeals cannot make original findings of fact, it can only "unfind" facts. *City of Beaumont v. Graham*, 441 S.W.2d 829, 832-33 (Tex. 1969). The judgment of the trial court confirms that no finding of actual damages in tort was made in the trial court. That judgment awards actual damages of only $300,964, the amount found by the jury to be Brown's damages for breach of contract.

The judgment of the trial court, however, does award $1,000,000 as punitive damages. Inclusion of punitive damages in the judgment is error because punitive damages are not recoverable for breach of contract. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex. 1981). In a proper case, punitive damages are recoverable when the action is one in tort, but as a predicate to recovery the plaintiff must show that he has suffered actual damages. *Doubleday & Company, Inc. v. Rogers*, 674 S.W.2d 751, 753-54 (Tex. 1984).

Brown argues that the present case is an exception to the above rules because it involves claims both in contract and in tort. He contends that a plaintiff may recover punitive damages in addition to contact damages when a distinct, willful tort is alleged and proved along with the contract action. In such a case, Brown concludes, actual damages in tort are no longer a predicate to punitive damages so long as the plaintiff has suffered some damages as a result of the breach of contract.

In making this argument Brown misinterprets several cases, the most recent of which is *City Products Corp. v. Berman*, 610 S.W.2d 446 (Tex. 1980). In *Berman* we said:

> When a distinct, willful tort is alleged and proved in connection with a suit upon a contract, one may recover punitive damages, but even in that instance the complainant must prove that he suffered some actual damages.

*Id.* at 450. The joinder of a claim in contract with a claim in tort does not alter the basic principles: punitive damages are not awarded for breach of contract, *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 571; the award of damages in tort is a prerequisite to recovery of punitive damages. *Doubleday & Company, Inc. v. Rogers*, 674 S.W.2d 751, 753-564.

The above statement from *Berman* does not create an exception to the general rules nor does it support Brown's contentions. Because Brown failed to obtain a finding of damages in tort, he failed to establish all necessary elements of his claim for tortious interference with contract. Brown is not entitled to the award of punitive damages because he failed to prove he suffered any actual damages in tort.

*Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744-45 (Tex. 1986).

In the instant case we face the curious situation where the assault on Shockley was all but stipulated:

> THE COURT: Defense would agree that there was an assault and that the contract was breached, and it's just a matter of the damages of the damages arising from those two instances?
> MR. CONGER: That's right.

After hearing the proof, the jury returned a verdict specifically denying compensatory damages but awarding punitive damages.

Under the rule in *Allen, Whittington, Emerson v. Garner*, 732 S.W.2d 613 (Tenn.Ct.App. 1987), and *Beaty v. McGraw*, 15 S.W.3d 819, 830 (Tenn.Ct.App. 1998), the trial court was correct in finding that there was no basis to submit the punitive damages issue to the jury.

III.    The Trial Court's Refusal to Consider or Instruct the Jury Concerning Punitive Damages for Breach of Contract

In the rarefied atmosphere of appellate chambers and with the benefit of unerring hindsight it is easy to see where this entire punitive damages issue got derailed in the trial court. The front line troops under the gun in the trial court do not enjoy the same luxury. The verdict form used did not distinguish between punitive damages based upon tort and punitive damages based upon breach of contract. It simply allowed the jury to say after finding that no compensatory damages should be awarded for the assault and that Shockley should receive $57,500 damages for the breach of contract: "(3) Joseph Crosby did act in such a way that punitive damages should be awarded."

It became evident that the jury was having problems when they twice sent questions from the jury room indicating their difficulties. Relative to the first inquiry from the jury the record indicates:

> THE COURT: Gentlemen, we have a written question here from the jury. Number one, what is the difference between compensatory damages and punitive damages? I think if we give them the verdict form - - or not the verdict form, but the instruction, that may clarify, and I will pull out those two, what compensatory damages are and what punitive damages are, and send them back and see if it helps them.
> And the question is: Do we decide how much to award for the assault, or does the Judge award it? I think that can be simply answered. If they find in No. 4, that the assault - - the question is by Joseph Crosby cause injury to Carl Shockley for which compensatory damages should be awarded. If they find yes, then they are to make that determination, correct? [sic]

MR. MILLS: Yes.

As to the second jury question the record discloses:

THE COURT: Ladies and gentlemen, we have another question from the jury. Is this the question they wrote down?

COURT OFFICER: Yes, sir.

THE COURT: The question is: Who assesses amount for punitive damages? And that will simply be - - the response that you should give them is that they are not to address that question. At this time they are only to address the question of whether punitive damages are appropriate based on the instruction given. Any problem with that, gentlemen?

MR. CONGER: No, sir.

Thereafter the jury returned to announce its verdict whereupon the following occurred:

Gentlemen, in the jury verdict form, we, the jury, unanimously find as follows: Did the assault by Joseph Crosby cause injury to Carl Shockley for which compensatory damages should be awarded? The answer is no. We award the following damages: Breach of contract, $57,500; the assault is left blank. I assume that is to be zero; is that correct, sir? You found that there was - -

FOREPERSON: The top one?

THE COURT: Yes. No compensatory damages should be awarded for the assault, and the assault compensatory is left blank, which would indicate an award of zero. If you awarded damages, answer the next question. If you did not award damages, sign the verdict form.

No. 6: Did Joseph Crosby act in such a way that punitive damages should be awarded? The answer, yes, is checked, dated 10-8-02, Dolphin H. Mosely. Is this verdict agreed by all of you? If so, would you indicate by raising your right hand? (Whereupon all jurors raised right hands with no dissenting votes)

THE COURT: All right. Ms. Reporter, let the record indicate that each member has raised their hands. Gentlemen, I think at this point we probably need a hearing outside the jury, correct?

The jury at this point was asked to return to the jury room and the problem with the jury's responses became evident to the trial court and the attorneys with counsel for the plaintiff observing:

MR. MILLS: I guess after this many years you start wondering, all right, if Murphy's law could kick in and answer one thing one way and one the other, what does that mean.

THE COURT: Yeah. It can happen and will, as it just did.

-18-

The trial court and counsel then struggled at length with the question of punitive damages for breach of contract with the trial court ultimately finding that punitive damages could not be supported on the breach of contract issue because of fraud, malice, gross negligence, or oppression as those elements are discussed in *Medley v. Chesterton Co.*, 912 S.W.2d 748 (Tenn.Ct.App. 1995). The trial court thereupon declined to allow the jury to proceed with the second part of the bifurcated hearing as to punitive damages required by *Hodges v. Toof*, 833 S.W.2d 896 ) (Tenn. 1992) stating:

> I'm going to rule that the punitive damages cannot be awarded because there was no award for compensatory damages in the assault case; and that the standard rule that no punitive damages are awarded in a contract case applies here in the exceptions, and the Court does not find that the exceptions be found by a fact finder, in this case, the jury.

The trial court thereupon observed with the unerring accuracy of wisdom born after the fact:

> THE COURT: Yes. I think they reached an - - I won't call it inaccurate, but they reached a conclusion - - and it's probably our fault between the three of us. The verdict form that was provided did a good job, but it only said if you awarded damages, and probably should have said if you awarded damages for the assault, answer the next question. Or we could have resolved this issue ahead of time about the breach of contract needing to involve fraud, malice, gross negligence, or oppression.

Considering this record in its entirety nothing that the jury ever heard could have put them on notice that they were being called upon to determine an issue of punitive damages based upon breach of contract. Doubtless after the trial court had directed the jury to find for the plaintiff on the assault count of the complaint, neither the trial court nor trial counsel envisioned the jury returning a verdict for no damages on the assault count. There is further no indication in the record that anybody ever contemplated punitive damages on the breach of contract count of the complaint. The plaintiff did not ask for punitive damages on the first count of the complaint which was the portion of the complaint asserting breach of contract. This count of the complaint asserts in part:

> 8.      Pursuant to the contract, Joseph Crosby and Opal Crosby must indemnify Carl Shockley for losses sustained by him as a result of breach of the contract.
>
> 9.      Carl Shockley has duly performed his duties under the terms and conditions of the contract, and in fact, has exceeded those requirements in the contract. Carl Shockley has performed the terms and conditions of the contract up until the point Joseph Crosby terminated the contract at gunpoint. For the reasons foregoing, Carl Shockley has been damaged in the sum of at least $125,000.00 in lost profits, plus the cost and expenses incurred as a result of inability to make payments on equipment rented and purchased specifically for this contract, in an amount as yet to be determined.

Only count II of the complaint charging "assault and outrageous conduct" asserts a claim for punitive damages. In the "prayer for relief" of the complaint Plaintiff asserts: "Plaintiff Carl Shockley demands judgment against Joseph Crosby for compensatory damages in an amount not less than $10,000.00 and an amount not less than $50,000.00 punitive damages for assault and outrageous conduct."

The charge to the jury on punitive damages is couched entirely in terms of tort liability referring only to fault, wrongdoing, gross deviation from the standard of care, and injury. This portion of the charge in its entirety states:

> The plaintiff has also asked that you make an award of punitive damages, but this award may only be made under the following circumstances: You may consider an award of punitive damages only if you find that the plaintiff has suffered actual damages as a legal result of the defendant's fault and you have made an award for compensatory damages. The purpose of punitive damages is not to further compensate the plaintiff, but to punish a wrongdoer and deter others from committing similar wrongs in the future.
> Punitive damages may be considered if, and only if, the plaintiff has shown by clear and convincing evidence that a defendant has acted either intentionally, recklessly, maliciously, or fraudulently. Clear and convincing evidence is a different and higher standard than a preponderance of the evidence. It means that the defendant's wrong, if any, must be so clearly shown, that there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.
> A person is acting intentionally when it is the person's purpose or desire to do a wrongful act or to cause the result. A person acts recklessly when the person is aware of, but consciously disregards a substantial and unjustifiable risk of injury or damage to another. Disregarding the risk must be a gross deviation from the standard of care that an ordinary person would use under all of the circumstances. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts fraudulently when the person intentionally either misrepresents an existing material fact or causes a false impression of an existing material fact to mislead or to obtain an unfair or undue advantage, and another person suffers injury or loss because of the reasonable reliance upon that representation.
> If you decide to award punitive damages, you will not assess an amount of punitive damages at this time. You will, however, report your finding to the Court on the jury verdict form.

One may search this record, technical and testimonial, in vain for the slightest indication that anyone ever contemplated an issue of punitive damages based upon breach of contract prior to the apparently stunning verdict of the jury triggering Murphy's law. These remarks should be in no way construed as critical of either the trial court or counsel, all of whom were taken aback by a totally

unexpected verdict.[2] The pleadings of the parties did not contemplate such issue. Counsel for the plaintiff in closing argument negates such an issue and, after discussing breach of contract damages alleged to be $127,500 in conformity with his allegations in count one of the complaint relative to breach of contract, addresses the case for punitive damages solely on the assault count of the complaint wherein he has sought $10,000 compensatory damages and $50,000 in punitive damages.

> Now, there's another part of the lawsuit that I told you about, and that's the assault, and the Judge has already ruled that there was an assault. And there was a whole lot of hay made about whether the gun was here or here or here on Mr. Crosby's arm. I couldn't have told you where the gun was. All I would have seen is the barrel of that gun if I had been on the other end of it.
>
> And Mr. Shockley didn't want to say what he felt like, but he finally said, I kind of felt weak kneed. I asked everybody in the jury panel if you ever had a gun pointed at you, and everybody said no. I never have either. I hope I never do. But I put it to you that that does scare you, and it does cause you a little anxiousness, because here's a man that everybody described as frightened. . . .
>
> Now, I'm not here - - and they're going to make a big deal out of me suing for $60,000. I'm not telling you it's worth $60,000. What I am telling you is what we sued for - - up to $10,000 for pointing a gun, having a gun pointed at him. I don't know what I would take to have somebody point a gun at me. It wouldn't be $100. It wouldn't be $500. It wouldn't be $1,000. I guess if I knew they wouldn't shoot me, I would be getting close somewhere in there, but he didn't know if he was going to get shot. But it's up to you, and the Judge will tell you there's no mathematical formula to figure that. It's just up to your common sense, what you think is fair for what you go through when somebody points a gun at you.
>
> And then there's one more question, and the Judge will give you a verdict form to fill out. You'll have to answer these questions. And it says: Did Mr. Crosby act in such a way that you think he ought to be punished, that punitive damages should be awarded. And that's the assault issue. And I'm going to ask you to answer that question yes, not to compensate Mr. Shockley, but to stop Mr. Crosby from ever pointing another gun at anybody else, from ever breaching another contract, not by writing a letter to the lawyer or calling your lawyer and have him call somebody else's lawyer, but at the point of a gun, behind a truck, holding a shotgun on somebody. If anything in 2002, in Spencer, Tennessee, warrants somebody being punished, it's that.
>
> And if you award damages for the assault, for the compensatory damages of the assault, for the fear, and you say that, yes, we're going to have to award some punitive damages, we will address that issue. That's up to you. And that's almost

---

[2] One is reminded of Winston Churchill's lament at the time of the impending fall of the port of Singapore to the Japanese when he was informed that all guns were pointed seaward and none toward the landward approaches in the rear. "The possibility of Singapore having no landward defenses no more entered my mind than that of a battleship being launched without bottom." Winston S. Churchill, The Second World War, v. 4, "The Hinge of Fate" p. 49.

an issue of what you want your community to be like, what you think it stands for and how you want things done these days. I said that when I started, this is not Dodge City in 1870, this is not Chicago in 1920, and, by George, nobody ought to be pointing guns at anybody, not in 2002.

Now, Mr. Conger gets to get up here. I wish he would explain to you why Mr. Crosby didn't testify, but he doesn't have to, but he doesn't have to. But explain why pointing a gun at somebody doesn't warrant some damages, doesn't warrant some punishment. We think it does.

Under these circumstances it is difficult to see how any issue of punitive damages based upon breach of contract was tried by implied consent under T.R.C.P. 15.02 since such issue never arose in the case until after the verdict of the jury was in. *See Hiller v. Hailey*, 915 S.W.2d 800 (Tenn.Ct.App. 1995).

The question of punitive damages based upon breach of contract is not within the scope of the issues drawn by the pleadings. If the issue is to be within the scope of the triable issues in the case it must appear that the issue was tried by implied consent within the meaning of T.R.C.P. 15.02.

In *McLemore v. Powell*, 968 S.W.2d 799 (Tenn.App. 1997) the pleadings did not encompass an issue of breach of contract. In discussing trial by implied consent this court stated:

> Because the case went to trial despite the fact that pleadings did not encompass a cause of action for breach of contract, we must determine whether this issue was tried by the implied consent of the parties under Tenn. R. Civ. 15.02. The Rule reads in pertinent part as follows:
>
> > When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.
>
> Tenn. R. Civ. P. 15.02. Implied consent hinges on the issues that were actually litigated by the parties, and the failure to amend or to request to amend is not dispositive. *Zach Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890 (Tenn. 1980).

968 S.W.2d 799 at 803.

In order to find trial of an issue by implied consent the court must find that the evidence introduced at trial on such unpleaded issue falls outside the scope of the issues drawn by the pleadings. In finding that breach of contract was not tried by implied consent in *McLemore*, Judge Crawford held:

Additionally, the evidence introduced at trial on the contract for the purchase of cattle did not fall outside the scope of the issues raised by the pleadings so as to constitute implied consent to the trial of a separate claim for breach of contract. The surrounding circumstances, including the evidence as to whether Nelson was acting as Powell's agent when he entered into the alleged contract, were relevant to the issue of whether Nelson was acting as Powell's agent when he executed the promissory note. Because the evidence concerning the contract was relevant to the claim on the promissory note, it cannot be said that a separate breach of contract claim was tried by the implied consent of the parties.

Under the principles above, we cannot say that the issue of the breach of contract was tried by the implied consent of the parties.

*McLemore v. Powell*, 968 S.W.2d 799, 804 (Tenn.Ct.App. 1997).

The stated rule is a rule of general application in other jurisdictions. *Raimi v. Furlong*, 702 So.2d 1273 (Fl.Dist.Ct.App. 1997) (review denied 717 So.2d 531 (Fla. 1998)); *Coleman v. Mantia*, 25 S.W.3d 675 (Mo.Ct.App. 2000); *Muir v. Rader*, 945 S.W.2d 33 (Mo.Ct.App. 1997); *Tormaschy v. Tormaschy*, 559 N.W.2d 813 (N.D. 1997); *Johnston v. McKinney America, Inc.*, 9 S.W.3d 271 (Tex.Ct.App. 1999).

In *Members Interior Constr. v. Leader Constr.*, the Court of Appeals of North Carolina addressed the issue when, after the close of its case in chief, Plaintiff attempted to amend its' complaint under N.C.R. Civ. P. 15(b) to allege a statutory violation not previously pleaded. Since the evidence introduced by Plaintiffs also supported the plaintiff's properly pleaded breach of contract action, the court refused to allow the proffered amendment and declined to consider the statutory violation:

When, as here, evidence is introduced without objection, a Rule 15(b) motion should be granted only if the parties understand the evidence is aimed at an issue not expressly pleaded. *See J.M. Westall & Co. v. Windswept View of Asheville*, 97 N.C. App. 71, 76, 387 S.E.2d 67, 69-70, *disc. review denied*, 327 N.C. 139, 394 S.E.2d 175 (1990). Where the evidence which supports an unpleaded issue also tends to support an issue properly raised by the pleadings, however, failure to object does not amount to implied consent to try the unpleaded issue. *Tyson v. Ciba-Geigy Corp.*, 82 N.C. App. 626, 630, 347 S.E.2d 473, 476 (1986).

*Members Interior Constr. v. Leader Constr.*, 476 S.E.2d 399, 402 (N.C.App. 1996).

The trial court charged the jury relative to the elements of fraud, malice, gross negligence, and oppression as those elements relate to punitive damages under *Hodges v. Toof*, 833 S.W.2d 896 (Tenn. 1992). Under *Hodges v. Toof* these elements are common to both tort and contract. Evidence supporting those elements was introduced in this case where the tort of assault was properly pleaded. Since the evidence was not alone applicable to the unpleaded contract issue it was not tried by

implied consent under the principles laid down in *McLemore v. Powell*. While a motion to amend is not absolutely necessary under T.R.C.P. 15.02 if the issue is otherwise tried by implied consent, the issue of punitive damages for breach of contract would not have been tried by implied consent under *McLemore v. Powell* even if a proper amendment had been proffered.

The issue raised by Shockley in this court is "the trial court should have instructed the jury on, and allowed the jury to consider, punitive damages for breach of contract under the facts presented." Appellant never sought an instruction to the jury relative to punitive damages based upon breach of contract. While the elements of fraud, malice, gross negligence, and oppression are elements common to the award of punitive damages either in tort or in contract under *Hodges v. Toof*, 833 S.W.2d 896 (Tenn. 1992), Appellant cannot put the trial court in error for failing to charge the jury under these circumstances. The action of the trial court relative to punitive damages for breach of contract is affirmed.

IV.     Remittitur

Upon the defendants' motion for a new trial, the trial court suggested a remittitur in the amount of $7,500 from the general verdict awarding $57,500 in damages from the breach. Shockley challenges the remittitur here.

The statute provides the duty placed upon the trial judge and the standard of review we must apply in examining the trial court's action:

> (a) In all jury trials had in civil actions, after the verdict has been rendered, and on motion for a new trial, when the trial judge is of the opinion that the verdict in favor of a party should be reduced, and a remittitur is suggested by him on that account, with the proviso that in case the party in whose favor the verdict has been rendered refuses to make remittitur a new trial will be awarded, the party in whose favor such verdict has been rendered may make such remittitur under protest, and appeal from the action of the trial judge to the court of appeals.
> (b) The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in Rule 13(d) of the Tennessee Rules of Appellate Procedure applicable to decisions of the trial court sitting without a jury. If, in the opinion of the court of appeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the court of appeals for the full amount originally awarded by the jury in the trial court.

Tenn. Code Ann. § 20-10-102.

In granting the remittitur the trial court held:

The issue raised in paragraph three of the Defendants' motion is well-taken. It appears from the transcript that under the original contract there was no discussion about the Plaintiff being required to use a cutter to remove the trees frm the Defendants' property. It was the Plaintiff's testimony that months into the contract the Defendant requested and/or stated that the Plaintiff should use a cutter instead of a chainsaw to remove the trees. Plaintiff had the opportunity at that point to seek assistance from the Court if he felt this was a breach of the original contract. However, it was not proven that the Plaintiff would have been prohibited from logging the trees and a chainsaw, although that appeared to be the Defendants' indication. It is unknown whether the Defendants would have allowed the Plaintiff to complete the contract with chainsaws as he had begun. Therefore, the jury's verdict stands as rendered with the exception that their award of $57,500.00 to the Plaintiff is reduced by the sum of $7,500.00, for a total award of $50,000.00.

As our supreme court has held, "[T]rial judges may suggest adjustments when the jury verdict is within the range of reasonableness, as an alternative to the practice of granting a new trial, if they are of the opinion that the jury verdict is not adequate. T.C.A. § 20-10-101. *See also*, T.C.A. § 20-10-102." *Foster v. AmCon International, Inc.*, 621 S.W.2d 142, 147 (Tenn. 1981).

The proof adduced at trial establishes a fairly broad range of reasonableness. The trial court found in its order that the $7,500 was not properly considerable as a measure of damages, and was indeed considered by the jury despite the general nature of the verdict. The action of the trial court is in keeping with the rule stated by this court in *Baker v. Riverside Church of God*, 453 S.W.2d 801 (Tenn.Ct.App. 1970):

> A general statement of the rule is found in Corpus Juris Secundum as follows:
> 'As a general rule, sometimes expressed in statutory enactments, the damages to which one party to a contract is entitled because of a breach thereof by the other are such as arise naturally from the breach itself, or such as may reasonably be supposed to have been within the contemplation of the parties at the time of making the contract as a probable result of a breach thereof, or, as sometimes stated, such as were reasonably foreseeable and within the contemplation of the parties at the time they made the contract.
> Conversely, damages which do not arise naturally from a breach of the contract, or which are not within the reasonable contemplation of the parties, are not recoverable. The promisor is not required to compensate the injured party for injuries which the promisor, when he made the contract, had no reason to foresee as the probable result of his breach.' Vol. 25 C.J.S. Damages s 27a, pp. 662--667.

*Baker*, 453 S.W.2d at 809. The trial court's action on the motion is affirmed.

V.    Juror Don Dewayne Shockley

The jurors sworn included Don Shockley but excluded Ronald Shockley.  The voir dire transcript reveals very little information as to the actual nature of the jurors' Shockley relationship to the plaintiff.  Nonetheless when asked of any kinship or relationship two hands were raised.  At this point in the proceeding all parties are on notice as to the possible kinship problems inherent in Tennessee Code Annotated section 22-1-105.  The defendant was afforded adequate opportunity to explore that relationship.  The challenge presented to this court is one of *propter defectum*.  The well settled rule in this jurisdiction provides that, absent some concealment on the part of the juror, a kinship as contemplated by the statute amounts to a disqualification *propter defectum* rather then *propter affectum*.  These juror challenges are explained thus:

> There are two broad classes of causes for challenge of a juror: (1) propter defectum (on account of some defect) from personal objections as alienage, infancy, lack of statutory requirements, etc., and (2) propter affectum (on account of partiality) from some bias or partiality either actually shown to exist or presumed to exist from circumstances.  *Durham v. State*, 182 Tenn. 577, 188 S.W.2d d555 (1945).
> Generally, objections to a juror based upon causes propter defectum cannot be made after verdict.  *Monday v. State*, 160 Tenn. 258, 23 S.W.2d 656 (1930); *Nashville C. & St. L. Ry. v. Williams*, 164 Tenn. 144, 46 S.W.2d 815 (1932).  The reason for the rule is that a mere technical defect, or the failure to a juror to meet the certain required qualifications, does not raise the presumption of bias on his part.  Unless prejudice be actually shown it cannot be presumed that the technically incompetent juror was not impartial and fair in his deliberations.
> However, objections to a juror based upon causes propter affectum may be made after verdict.  *Durham v. State, supra*.  The ground for challenge in the instant case is the deliberate withholding of information asked for on voir dire.  This amounts to false swearing and does raise the presumption of bias and partiality.

*Tennessee Farmers Mutual Company v. Greer*, 682 S.W.2d 920, 923-4 (Tenn.Ct.App. 1984).

The record before us shows no such misconduct by juror Shockley.  Counsel for both parties were afforded an opportunity to examine the juror in question.  Counsel Mills conducted voir dire on behalf of the plaintiff Shockley.  The record of that examination reveals the following exchange:

> MR. MILLS: How many people that raised their hands are related to him and will admit to it?
> (two hands raised).
> MR. MILLS: Does that mean the rest of you are not related or you're not admitting to it?  What is your name sir?

> JUROR: Ronnie Shockley.
> MR. MILLS: That would make sense that you are related.  How are you related?
> JUROR: I'm his first cousin.
> MR. MILLS: Okay.
> JUROR: I'm related to him way off.
> MR. MILLS: Some distant cousin?
> JUROR: Yes, about four or five down.

There were two jurors with the Shockley name called for service on October 8, 2002, Don Shockley and Ronnie Shockley.  When Mr. Conger, counsel for the defendants conducted his voir dire the sum of his questions as to relationship or kinship is as follows:

> MR. CONGER: And about half of you knew Mr. Shockley here; is that about right?  Let's see that show of hands again that knows Mr. Shockley.
> (Hands raised).
> MR. CONGER: And this Mr. Shockley was a distant relative of his?
> JUROR: Yes.
> MR. CONGER: You said third or fourth cousin, somewhere down the line?
> JUROR: Yes.

Counsel chose not to delve further into the alleged relationship between the plaintiff and the juror Don Dewayne Shockley, nor did he challenge the prospective juror either for cause or by peremptory challenge.

> The common law rules governing challenges to juror qualifications fall into two general categories: (a) propter defectum or (2) propter affectum.  *Partin v. Henderson*, 686 S.W.2d 587, 589 (Tenn.App. 1984), *perm. to appeal denied, id.* (Tenn. 1985).  Objections based upon general disqualifications, such as alienage, family relationship, or statutory mandate, are within the propter defectum class and, as such, are considered waived if not made prior to the swearing of the jury.  *Murphy v. State*, 560 s.W.2d 414, 415 (Tenn.Crim.App. 1977), *cert. denied, id.* (Tenn. 1978).

*State v. Brock*, 940 S.W.2d, 577, 579 (Tenn.Crim.App. 1996).

VI.  Proof of Damages

Appellees' claim that the proof of damages offered by Shockley is inadequate to sustain the jury verdict and the judgment of the trial court because of the general prohibition against the award of speculative damages.  Appellees admit the breach of the contract, and Shockley offers evidence as to his damages.  The prohibition against speculative damages applies generally to the existence of damages and loses its potency when it is interjected as a challenge only to the extent of the damages.

The courts will allow recovery even if it is impossible to prove the exact amount of damages from the breach of contract. Otherwise, in certain instances, the courts would be powerless to help some wronged parties. "Exact justice is not always attained, and the law does not require exactness of computation in suits that involve questions of damages growing out of contract or tort." *Provident Life and Accident Ins. Co. v. Globe Indemnity Co.*, 156 Tenn. 571, 576, 3 S.W.2d 1057 (1928). In *Coverdell v. Mid-South Farm Equipment Assoc., Inc.*, 335 F.2d 9 (6th Cir. 1964), the court applied Tennessee law to determine that an insurance company agent who was informed by trustees of the defendant corporation that he had been hired under a personal service contract to organize their group insurance, worked an entire weekend on the project, and cancelled an appointment in Texas was damaged when the trustees gave the contract to another agent. Uncertain and speculative damages are prohibited only when the existence of damage is uncertain, not when the amount is uncertain. When there is substantial evidence in the record and reasonable inferences may be drawn from that evidence mathematical certainty is not required. *Id.* at 14.

*Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn.Ct.App. 1983); *see also Moore Constr. v. Clarksville Dep't of Electricity*, 707 S.W.2d 1, 15 (Tenn.Ct.App. 1985).

While the testimonial proof of damages offered by Shockley is less than exact, the record is sufficient to support the judgment in this case and the evidence does not preponderate against the judgment of the trial court as to compensatory damages, modified as it is by his grant of the remittitur. The judgment of the trial court is in all respects affirmed and the case is remanded to the trial court for such further proceedings as may be necessary.

Costs are assessed against Appellants.

_____

WILLIAM B. CAIN, JUDGE