**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0438n.06
Filed: June 27, 2006

No. 05-5750

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARK HINTON, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | **ON APPEAL** FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| WACHOVIA BANK OF | ) | DISTRICT OF TENNESSEE |
| DELAWARE NATIONAL | ) | |
| ASSOCIATION and WACHOVIA | ) | |
| MORTGAGE CORPORATION, | ) | **O P I N I O N** |
| | ) | |
| **Defendants-Appellees.** | ) | |
| | ) | |

Before: MOORE, GRIFFIN, and CUDAHY,[*] Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Mark Hinton appeals the dismissal, pursuant to a motion for summary judgment, of his claims for breach of contract and intentional infliction of emotional distress ("IIED") under Tennessee law and for violation of the Tennessee Consumer Protection Act ("TCPA"), TENN. CODE ANN. § 47-18-104, against Defendants-Appellees Wachovia Bank of Delaware National Association ("Wachovia Bank") and Wachovia Mortgage Corporation ("Wachovia Corporation") (collectively referred to as "Wachovia"). Because Hinton breached the agreement he had with Wachovia and therefore suffered no damages from any

---

[*]The Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

of Wachovia's alleged wrongdoing, and because Wachovia's conduct was not outrageous, we **AFFIRM** the grant of summary judgment.

## I. BACKGROUND

In November 1998, Hinton and his then wife refinanced their home with HomEq, and in so doing executed a Fixed Rate Note ("Note") and a Deed of Trust ("Deed"). Wachovia Bank is the note holder, and Wachovia Corporation services Wachovia Bank's loans as HomEq. Hinton and his wife divorced in 2001, and Hinton took full interest in their home. Under the Note, Hinton was to make 360 consecutive monthly payments of $793.93 by the thirtieth day of each month. The Note stated that a default entitled Wachovia "to declare the entire unpaid balance of this written indebtedness due and payable at once and to foreclose any Security Instrument securing this Note." Joint Appendix ("J.A.") at 132 (Note at 2). Additionally, the Note provided that the "[f]ailure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of a subsequent default." *Id.*

By January 2001, Hinton had defaulted on this agreement by making late payments, and then further defaulted by failing to pay his 2001 property taxes. To protect its security interest in the property, Wachovia advanced the funds to pay the property taxes. HomEq notified Hinton that he was in default on the basis of the late payments and the failure to pay property taxes and that his property was at risk of foreclosure. Hinton then filed for bankruptcy. Wachovia did not take any foreclosure action.

On February 7, 2002, Hinton and Wachovia entered into their first of three Default Forbearance Agreements ("DFA"). Each of these DFAs states that "Lender is not discontinuing foreclosure," but "is only holding further foreclosure action in abeyance as long as the Borrower

makes all regularly scheduled payments and arrears payments." J.A. at 146 (Feb. DFA at 2), 149 (May DFA at 2), 153 (Dec. DFA at 5). The DFAs also state that Wachovia can foreclose "without . . . mailing another demand/notice of intent to accelerate" if Hinton defaults. J.A. at 146 (Feb. DFA at 2), 149 (May DFA at 2), 153 (Dec. DFA at 5).

The February DFA required Hinton to make a $2000 down payment by February 15, 2002 and a monthly payment of $345.91 plus a "regular payment" by the tenth day of each month thereafter for eighteen months. J.A. at 145 (Feb. DFA at 1). The February DFA specifies that Hinton owed "7 Payment(s) due @ $793.94," which totals $5557.58.[1] *Id.* Under the February DFA, Hinton's monthly payment was $1139.85, which was $345.91 plus the "regular payment" of $793.94. *Id.* Hinton paid the $2000 down payment on February 15, 2002. However, Hinton's next payment was not until April 3, 2002, when he made a payment of $1150. Hinton then made a payment of $1150 on May 13, 2002. This put Hinton in default of the February DFA for failing to make timely payments in March, April, and May. Hinton received a letter notifying him that his house was subject to foreclosure.

Hinton then entered into a second DFA with Wachovia on May 22, 2002. Under the May DFA, Hinton was to pay a $1900 down payment by May 22, 2002, and then monthly payments of $389.66 plus a "regular payment" by the twenty-fifth day of each month thereafter for eighteen months. J.A. at 24-26 (May DFA at 1-3). The May DFA specified that Hinton owed "8 regular

---

[1]Combined with the other charges owed by Hinton listed in the February DFA, Hinton owed a total of $8226.38. The $345.91 payment multiplied by the eighteen payments listed in the DFA plus the $2000 down payment equals $8226.38.

payments," which was followed by $7101.77.[2] *Id.* The May DFA does not specifically state a dollar amount for the "regular payment." *Id.* The parties dispute the amount of the "regular payment" under the May DFA. Wachovia claims that it is $887.72, which is the $7101.77 divided by the eight payments. Hinton claims that it continued to be $793.93 or $793.94,[3] as specified in the Note. Under Wachovia's view, Hinton owed $1277.38 per month; under Hinton's view, Hinton owed $1183.60 per month. The parties additionally dispute whether Hinton made the $1900 down payment. As stated above, Hinton made a payment of $1150 on May 13, 2002, and then another payment of $1150 on May 22, 2002. Hinton then made monthly payments of $1200 on June 25, July 25, August 22, September 25, and October 24 of 2002. Wachovia accepted each of these payments except the last, which it refused based on its belief that Hinton was in breach because Hinton's monthly payments each fell short of what it believed to be the required monthly payment of $1277.38.[4] Hinton again received notice that his house was subject to foreclosure.

Hinton then entered into a third DFA with Wachovia on December 11, 2002. The December DFA stated that Hinton owed a $2130 down payment by December 10, 2002, as well as monthly payments of $811.32 plus the "regular payment" by the twenty-fifth day of each month thereafter

[2]In combination with the other charges Hinton owed, the May DFA states that Hinton owed Wachovia a total of $8932.05. The $389.66 payment multiplied by the eighteen payments listed in the DFA plus the $1900 down payment equals $8913.88, which approximates the $8932.05 that Hinton owed under the May DFA.

[3]It is not clear why the February DFA stated that the payment owed was $793.94, a one cent increase from the $793.93 required by the Note.

[4]Additionally, although Hinton made his July payment on July 25, it did not post until July 26, one day late.

4

for twelve months.[5] J.A. at 151 (Dec. DFA at 1). The December DFA specifies that Hinton owed "7 payments @ 1061.26," which totaled $7428.82. *Id.* Hinton paid the $2130 down payment on December 10, 2002. He then made payments of $1720 on January 31, 2003, $155 on February 8, 2003, and $1900 on March 7, 2003. On April 28, 2003, HomEq sent Hinton a letter notifying him that his account was delinquent and that his home was under review for foreclosure. Foreclosure occurred in June 2003.

On September 10, 2003, Hinton filed a complaint against Wachovia in Tennessee state court alleging breach of contract, intentional infliction of emotional distress, and violations of the TCPA. Wachovia filed a Notice of Removal to remove the case to the Eastern District of Tennessee, and the case was properly removed.[6] On March 28, 2005, the district court granted Wachovia's motion for summary judgment on each of Hinton's claims. Hinton filed a motion to alter or amend the judgment, which the district court denied. Hinton appeals the March 28 judgment.[7]

---

[5]Hinton owed a total of $11,865.86 under the December DFA. The $811.32 payment multiplied by the twelve payments listed in the DFA plus the $2130 down payment equals the $11,865.86 that Hinton owed under the December DFA.

[6]The Supreme Court ruled earlier this year that for purposes of diversity jurisdiction, a national bank, such as the Defendant-Appellee Wachovia Bank, is a citizen of the state "designated in its articles of association as its main office," and *not* of each state in which it operates. *Wachovia Bank, N.A. v. Schmidt*, 126 S. Ct. 941, 952 (2006) (construing 28 U.S.C. § 1348 ("All national banking associations shall . . . be deemed citizens of the States in which they are respectively located.")). A corporation such as Defendant-Appellee Wachovia Corporation is a citizen *both* of the state or states in which it is incorporated *and* the state in which its principal place of business is located. 28 U.S.C. § 1332. Because Wachovia Bank's main office is in North Carolina, Wachovia Corporation is incorporated in North Carolina and also has its principal place of business there, and Hinton is a citizen of Tennessee, diversity of citizenship provided a proper ground for removal. 28 U.S.C. §§ 1332, 1348, and 1441; *Wachovia Bank, N.A.*, 126 S. Ct. at 952.

[7]Although Hinton also asks us to consider whether the district court abused its discretion in denying his motion to alter or amend the judgment, Hinton did not file a Notice of Appeal covering that order, and thus we decline to decide this question.

5

## II. ANALYSIS

### A. Standard of Review

We review de novo the district court's dismissal of Hinton's breach of contract, IIED, and TCPA claims pursuant to Wachovia's motion for summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We review motions for summary judgment viewing all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When we review a summary judgment decision in a breach of contract case, we apply the following "special interpretive framework":

> "[A] contract can be interpreted by the court on summary judgment if (a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity. . . . If the court finds no ambiguity, it should proceed to interpret the contract — and it may do so at the summary judgment stage. If, however, the court discerns an ambiguity, the next step — involving an examination of extrinsic evidence — becomes essential. . . . Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations."

*United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 406 (6th Cir. 2004) (alteration and omissions in original) (quoting *Gencorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999)).

### B. Breach of Contract

To show a breach of contract under Tennessee law, a party must prove "(1) the existence of a contract, (2) breach of the contract, and (3) damages [that] flow from the breach." *Life Care Ctrs.*

6

*of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir. 1996).

The crux of Hinton's breach claim is that Wachovia breached the May DFA by refusing to accept his October 24, 2002 payment of $1200 and then initiating foreclosure proceedings on his house. Hinton also claims that Wachovia breached the May DFA by failing to specify the amount of the "regular payment" that he owed Wachovia. Neither party disputes that the May DFA constituted a contract between the parties.

Wachovia claims that Hinton breached the May DFA in two ways: (1) by failing to make the required $1900 down payment, and (2) by coming $77.38 short on each of his monthly payments. In Wachovia's view, Hinton owed $1277.38 per month but paid $1200 per month.[8] The May DFA to which Hinton and Wachovia agreed states that if Hinton breaches, Wachovia is entitled to foreclose on the property. On this basis, Wachovia contends that it was entitled to reject Hinton's October payment and initiate foreclosure proceedings on the home.

Hinton's claim that Wachovia breached the May DFA by failing to state a sum certain for the "regular payment" amount is without merit. Hinton cites no authority for this proposition, and we have found none. An ambiguous term in the contract does not amount to a breach by the drafter. Rather, a significant disagreement over the meaning of a contract term could vitiate mutual assent, and thus no contract would ever have been formed. *See Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Local #3-677*, 811 S.W.2d 875, 879-81 (Tenn. 1991) (holding that both the lack of mutual assent and the indefiniteness of contract terms negate the existence of a contract);

---

[8]Wachovia arrives at this calculation by taking the $389.66 per month payment specified in the May DFA plus Hinton's "regular payment" of $887.72. J.A. at 24 (May DFA at 1). Wachovia determines the "regular payment" to be $887.72 by dividing $7101.77, the total of the eight "regular payments," by eight. *Id.*

RESTATEMENT (SECOND) OF CONTRACTS § 20(1) (1981) ("There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and (a) neither party knows or has reason to know the meaning attached by the other; or (b) each party knows or each party has reason to know the meaning attached by the other."). Hinton does not make such arguments.

Hinton contends that he did not fail to make the required down payment under the May DFA. He asserts that he made the down payment in two installments of $1150, paid on May 13, 2002 and May 22, 2002. Wachovia counters that only the May 22 payment can be considered towards the down payment of the May DFA because the May 13 payment was made before the May DFA was entered into on May 22, 2002. Additionally, Wachovia argues that the May 13 payment cannot be seen as part of the down payment because it was in an amount — $1150 — that Hinton had been paying for his monthly payments under the February DFA.

Hinton breached the May DFA by failing to make the requisite down payment of $1900. The first payment of $1150 made on May 13, 2002 cannot be considered part of his down payment because at the time he made that payment, the May DFA had not yet been created, and Hinton was obligated at that time to pay this sum towards the February DFA. The May 13 payment must therefore be seen as a monthly payment to fulfill his obligations under the February DFA, as he had not yet paid his May monthly payment under the February DFA. Because Hinton already owed Wachovia that $1150 to meet his obligations under the February DFA, that $1150 payment cannot be considered part of the down payment under the May DFA, which was not entered into until May 22, 2002. The $1150 payment made on May 22 is $750 short of the required down-payment amount. Hinton's failure to pay the required down payment on the May DFA constituted a breach

8

on his part, and this entitled Wachovia to foreclose on the property. Therefore, whether the May DFA permits separate payments, as Hinton argues, is of no consequence.

Hinton also argues that he made all of the required payments according to his understanding of the "regular payment" amount, and, therefore, he was not in breach, Wachovia was not entitled to initiate foreclosure proceedings, and Wachovia's initiation of such proceedings amounts to a breach. We need not reach this issue because Hinton breached the contract by failing to make the down payment before any regular payments were due, and Wachovia was entitled to foreclose on this basis.[9, 10]

---

[9]Further exploration of this claim reveals that Hinton read and signed the May DFA, and he understood that he could be charged additional fees under the agreement. However, Hinton claims that he did not understand that the "regular payment" amount for each month's payment under the May DFA was $887.72 rather than $793.94. Wachovia sent Hinton letters in February 2002 and December 2002 indicating that "[t]he noted reinstatement amount may change daily as additional legal costs, and late charges are incurred." J.A. at 157 (Feb. 7, 2002 HomEq Letter), 158 (Dec. 10, 2002 HomEq Letter). The $887.72 figure could be determined by a simple calculation of division, and could be fairly implied by "8 regular payments" followed by "$7101.77." J.A. at 24 (May DFA at 1). It is also the case, however, that the May DFA does not make clear that this is the amount that should be applied to the "regular payment" that is paid each month. HomEq's assistant vice president of the late-stage loss mitigation department suggested that Hinton's "regular payment" beginning March 30, 2002 was $1061.26. In any event, Hinton's breach of the May DFA for failure to pay the full down payment amount before the regular payments were due warranted Wachovia's initiation of foreclosure proceedings.

[10]Hinton also claims that Wachovia's establishment of an escrow account constituted a breach because neither the Note nor the Deed expressly permit such action. However, neither document explicitly bars the use of an escrow account, and Hinton makes no argument as to why Wachovia should not be permitted to utilize an escrow account under the agreements that he entered with Wachovia. In any event, because Hinton has not stated any damages that the escrow account caused him, he cannot state a claim for breach on this ground. *See Life Care Ctrs. of Am.*, 79 F.3d at 514 (concluding that damages are an essential element of a breach of contract under Tennessee law).

9

## C. Tennessee Consumer Protection Act

The TCPA states that "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." TENN. CODE ANN. § 47-18-109(a)(1). The TCPA prohibits "unfair or deceptive acts or practices" affecting commerce, including "[f]ailing to disclose that a charge for the servicing of any goods in whole or in part is based on a predetermined rate or charge, or guarantee or warranty, instead of the value of the services actually performed," and "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person." *Id.* § 47-18-104(a), (b)(15), and (b)(27). A "deceptive practice" can be demonstrated by evidence of "a material representation, practice or omission likely to mislead a reasonable consumer." *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997). No showing of deceptive intent is required. *Menuskin v. Williams*, 145 F.3d 755, 767-68 (6th Cir. 1998).

Hinton asserts that Wachovia's adding charges to the "regular payment" amount without disclosure and without giving Hinton a proper accounting of the additional charges or a sum certain that reflected those additional charges violated the TCPA. In particular, Hinton takes issue with Wachovia's failure to specify the dollar amount of his "regular payment" under the May DFA and alleges that the charges for the "Corporate Advances Recoverable" were duplicative of expenses under "Estimated Foreclosure Fees," "Escrow Shortage," "Miscellaneous Expenses," and "Late Charges Due." Appellant Br. at 26. Wachovia's failure to state the sum certain of the "regular payment" amount under the May DFA could mislead the reasonable consumer. It is not clear from

10

the May DFA how much Hinton was supposed to pay each month. Even if Hinton were to divide the $7101.77 amount by eight, it is still not clear that this amount refers to the forthcoming regular payments rather than the eight missed regular payments that are part of the total arrears due. We do not understand why Wachovia would not state the payment obligations more clearly. Wachovia would be well advised to do so in the future, as we have no sympathy for a lender that makes it difficult for its debtors to comply with payment obligations. However, Hinton's TCPA claim still fails because the ambiguity as to the "regular payment" amount did not lead to any damages due to the fact that Hinton breached the May DFA by failing to make the requisite down payment before any of the regular payments were due. *See* TENN. CODE ANN. § 47-18-109(a)(1) (limiting coverage to those who sustain "an ascertainable loss of money or property"). Hinton failed to present evidence that the corporate advances Wachovia sought to recover were duplicative of other charges.[11]

## D. Intentional Infliction of Emotional Distress

To establish an IIED claim under Tennessee state law, a plaintiff must demonstrate that: "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff." *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004). A successful claim requires showing that the defendant's actions were "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as

[11]Wachovia's conduct, even if deceptive, might not be covered by the TCPA because it is not clear under Tennessee law that such actions related to a forebearance agreement would be seen as affecting commerce. *See Pursell v. First Am. Nat'l Bank*, 937 S.W.2d 838, 840-42 (Tenn. 1996) (holding that a claim for deception regarding lender's repossession of debtor's collateral was not covered by the TCPA but explicitly refraining from exempting banking activities from the TCPA).

11

atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999)).

Hinton describes the following mental anguish he suffered as a result of Wachovia's conduct: "I couldn't sleep, I couldn't eat, I couldn't hardly work, . . . breaking out in hives, and like I say, you can't eat, can't sleep, wake up in the middle of the night 'cause it's always on my mind; still is." J.A. at 121 (Hinton Dep. at 82). As discussed above, Wachovia was entitled to initiate foreclosure proceedings on Hinton's home based on Hinton's failure to pay the full amount of the down payment under the May DFA. Therefore, the only conduct of Wachovia of which Hinton can complain is its failure to state a sum certain for the "regular payment" amount under the May DFA. This failure cannot be deemed "so outrageous" as to exceed "all possible bounds of decency." *Lourcey*, 146 S.W.3d at 51; *see also Menuskin*, 145 F.3d at 768. Moreover, although Hinton need not provide expert proof to support his IIED claim, Hinton's testimony regarding his mental distress does not demonstrate that it was "so severe that no reasonable [person] could be expected to endure it," as required to state an IIED claim under Tennessee law. *Miller v. Willbanks*, 8 S.W.3d 607, 615 n.4 (Tenn. 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965)).

### III. CONCLUSION

Because we conclude that Hinton breached the May DFA, we **AFFIRM** the grant of Wachovia's motion for summary judgment.

12